UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY, ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY AND PROPERTY AND CASUALTY INSURANCE COMPANY, <br><br> PLAINTIFFS, <br><br> -against- <br><br> LEAF ONE SUPPLY INC, GATE SUPPLY INC., TARA SUPPLY INC., MYKOLA HAIDARZHY, IRINA YAKUBIAK, NAZAR PETRUK, JOHN DOES 1 THROUGH 5 AND ABC CORPORATIONS 1 THROUGH 5, <br><br> DEFENDANTS. | CIVIL ACTION <br><br> 26-CV-1004 <br><br> COMPLAINT <br><br> (TRIAL BY JURY DEMANDED) |

Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company and Allstate Property and Casualty Insurance Company (hereinafter "**Plaintiffs**"), by their attorneys, Manning & Kass, Ellrod, Ramirez and Trester LLP, for their Complaint against Defendants Leaf One Supply Inc. ("Leaf One Supply"), Gate Supply Inc. ("Gate Supply"), Tara Supply Inc. ("Tara Supply"), Mykola Haidarzhy ("Haidarzhy"), Irina Yakubiak ("Yakubiak"), Nazar Petruk ("Petruk") (Leaf One Supply, Gate Supply, and Tara Supply are collectively referred to as the "**DME Defendants**") (Haidarzhy, Yakubiak, and Petruk are collectively referred to as the "**Retail Owner Defendants**") (collectively referred to as the "**Retail Defendants**"), John Does 1 through 5, and ABC Corporations 1 through 5 (collectively referred to with the Retail Defendants as "**Defendants**") allege as follows:

## PRELIMINARY STATEMENT

1.    From at least July 2024 and continuing through the date of the filing of this Complaint, Defendants engaged in a scheme to defraud automobile insurance companies, including Plaintiffs, through New York State's No-fault system.

2.    This action seeks to recover more than $117,000.00 that Defendants stole from Plaintiffs through the submission of hundreds of false and/or fraudulent insurance claims for rental

pain management durable medical equipment ("DME") devices, in particular MW Therapy as "Millimeter Wave Therapy ("MWT") Devices, Low Level Electromagnetic Therapy ("Cervical EMTT") Devices, and Cold Compression/Cryotherapy Devices (alternatively referred to herein as "Rental DME"). As used herein, (i) "DME" generally refers to equipment and/or supplies used for medical purposes by individuals in their homes, including, among other things, bed boards, cervical pillows, cervical collars, cervical traction units, cold/hot water circulating pumps, TENS units, hot/cold packs, infrared heat lamps, whirlpools, lumbar cushions, mattresses, orthopedic car seats, MWT Devices, Cervical EMTT Devices, ultrasound devices, electromagnetic devices, laser therapy devices, continuous passive motion devices, and/or compression devices; and (ii) "orthotic devices" generally refers to items that are used to support a weak or deformed body member or to restrict or eliminate movement for medical purposes. Such items include, but are not limited to, back braces, cervical collars, knee braces, shoulder braces and wrist braces.

3.      At all relevant times mentioned herein, each and every piece of Rental DME supplied by each DME Defendant was provided pursuant to a predetermined course of treatment, irrespective of medical necessity, based on illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics, as defined below.

4.      To execute the scheme to defraud alleged herein, the Retail Owner Defendants, through their respective DME Defendants, entered into separate arrangements with a purported DME wholesale company, Daytona Recovery Devices, a/k/a Daytona Recovery Inc. ("Daytona Recovery") (not named as a defendant in the Complaint), and one or more medical clinics operating in the New York metropolitan area that bills No-fault insurers for medical services (hereinafter "No-fault Clinics").

5.      Pursuant to these arrangements and in exchange for kickbacks and/or other financial compensation, the managers, owners and/or controllers of No-fault Clinics, which are not named as defendants in the Complaint, facilitated the scheme in several ways, including but not limited to:

(i) ensuring that their associated doctors and/or chiropractors (hereinafter "Health Care Practitioners" or "HCPs") prescribed identical Rental DME to their patient population, pursuant to a predetermined course of treatment irrespective of medical necessity, with the prescribed items being dictated by the Defendants, among others;

(ii) issuing, fabricating, falsifying, photocopied, and/or unauthorized DME prescription forms which the Clinic would then fill in with expensive and unnecessary DME; and/or

(iii) ensuring that the prescriptions were provided directly to the DME Defendants to ensure that the Retail Owner Defendants, through their respective DME Defendants, could bill Plaintiffs to purportedly fill the prescriptions rather than allow the possibility that the Covered Person may fill the prescription at a DME retailer of their own choosing.

6.      The use of template and/or boilerplate language in the fraudulent prescriptions enabled the Retail Defendants to: (i) misrepresent the nature and quality of the Rental DME prescribed and dispensed to the Covered Person, if any items were legitimately prescribed at all; (ii) misrepresent the medical necessity of the items that were dispensed to the Covered Person, if any items were dispensed at all; and (iii) fraudulently bill for products that would result in the highest forms of reimbursement from insurers, in general, and Plaintiffs, in particular.

7.      Pursuant to the fraudulent prescriptions, the DME Defendants routinely provided (or purported to provide) expensive Rental DME in connection with, and as part of a scheme to supply an identical battery of DME devices prescribed by the No-fault Clinics' HCPs to persons injured in automobile accidents insured by Plaintiffs (hereinafter "Covered Persons"), regardless

of medical necessity, in order to maximize reimbursement from insurers in general, and Plaintiffs in particular.

8.     In that regard, as a result of the large volume of fraudulent prescriptions provided by the No-fault Clinics to the DME Defendants, the No-fault Clinics enabled the Retail Owner Defendants, through their respective DME Defendants, to bill hundreds of thousands of dollars to Plaintiffs, for just a few devices in aggregate amounts exceeding $8,000.00 in total cost, despite the fact that it lacked any discernable accessible retail locations, without conducting any legitimate marketing or advertising, and without offering or selling a variety of DME beyond the few devices they dispensed.

9.     On information and belief, the Retail Defendants then paid kickbacks or other forms of compensation to the No-fault Clinics for the fraudulent prescriptions, which were transmitted directly by the Clinics to the Retail Defendants to support their claims for reimbursement.

10.     On information and belief, in many instances, the Retail Owner Defendants, through their respective DME Defendants, submitted or caused to be submitted to Plaintiffs prescription forms which they knew to be fabricated, fraudulently altered, duplicated, and/or unauthorized, in order to misrepresent the nature and/or type and medical necessity of Rental DME actually prescribed by the No-fault Clinics' HCPs, if any were prescribed at all.

11.     On information and belief, pursuant to similar agreements, and in exchange for kickbacks and/or other financial compensation, including, but not limited to, a share in the profits of the scheme to defraud, Daytona Recovery, provided one or more of the Retail Defendants with inexpensive and/or cheap knockoff items of expensive medical equipment, along with fraudulent wholesale invoices that grossly inflated the amounts the Retail Defendants paid for the Rental DME. Indeed, in many instances, the wholesale invoices provided by Daytona Recovery to the

Retail Defendants fraudulently reflected that the charges for DME had been paid in full, demonstrating that the "invoices" were, in fact, not actual bills sent to the Retail Defendants but, rather, sham documents designed solely for the purpose of creating the illusion that the Retail Defendants paid the grossly inflated prices on the wholesale invoices.

12.    After obtaining the fraudulent prescriptions from the No-fault Clinics, and/or fraudulent wholesale invoices from Daytona Recovery, the Retail Owner Defendants, through their respective DME Defendants, generated and submitted or caused to be generated and submitted bills to Plaintiffs, among others, knowingly misrepresenting the nature and type of the items, the amounts they were entitled to be reimbursed and/or and the medical necessity of the purportedly prescribed Rental DME.

13.    On information and belief, the Defendants acted in concert with one another pursuant to a common scheme or plan, obtaining fraudulent prescriptions from the same referring providers, Rental DME from the same wholesaler, and submitting charges for reimbursement on the same claims, with each DME Defendant providing a different price of Rental DME in furtherance of a fraudulent protocol of treatment for medically unnecessary Rental DME supplied as part of an elaborate kickback scheme in order to maximize reimbursement.

14.    In order to execute the scheme to defraud, at all relevant times mentioned herein, the Retail Owner Defendants, through their respective DME Defendants, engaged in one or more of the following actions: (i) paying kickbacks or other financial compensation to No-fault Clinics in exchange for fraudulent prescriptions of Rental DME; (ii) obtaining prescriptions that were provided pursuant to a predetermined course of treatment as opposed to medical need; (iii) obtaining and submitting to insurers, in general, and Plaintiffs, in particular, prescriptions which they knew to be fabricated, fraudulently altered, duplicated, and/or unauthorized; (iv) paying fees

to Daytona Recovery in exchange for fraudulent wholesale invoices that the Retail Defendants, in turn, would use to substantiate bogus claims for reimbursement of No-fault benefits; (v) arranging for the No-fault Clinics and/or HCPs to have assignments of benefits and acknowledgement of delivery of receipt forms pre-signed by Covered Persons to ensure that they had all of the documents necessary to submit claims to insurers, in general, and Plaintiffs, in particular; and (vi) systematically mailed or caused to be mailed, through their respective DME Defendants, bills to insurers, in general, and Plaintiffs, in particular, for Rental DME that the Retail Owner Defendants, through their respective DME Defendants, determined should be prescribed by the No-fault Clinics, with virtually every claimant receiving virtually identical Rental DME.

15.     At all relevant times mentioned herein, each and every claim submitted by the DME Defendants to insurers, in general, and Plaintiff, in particular, consisted of a claim form or bill, prescription and other purported supporting documentation that Retail Owner Defendants mailed or caused to be mailed through their respective Retailers to insurers, in general, and Plaintiff, in particular.

16.     At all relevant times mentioned herein, each and every bill and supporting documentation submitted by the Retail Owner Defendants, through their respective DME Defendants, contained the same or similar false representations of material facts, including, but not limited to one or more of the following: (i) false and misleading statements as to the nature and type of DME purportedly supplied to Covered Persons; (ii) false and misleading statements as to the amounts the DME Defendants were entitled to be reimbursed under the No-fault Law; (iii) false and misleading statements that the DME allegedly supplied were in fact the items supplied to the Covered Persons; (iv) false and misleading prescriptions for the DME purportedly supplied to Covered Persons, which generically described the item(s) in order to conceal the nature and type

6

of item(s) being prescribed and/or provided; (v) false and misleading wholesale invoices that greatly inflated the true cost and/or quantity of the Rental DME purportedly supplied to Covered Persons, and/or which falsely described that the invoices had been paid in full; and (vi) fabricated, false and misleading prescriptions for DME, concealing the fact that the DME either were not prescribed as alleged, or was prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby the same devices were purportedly provided to nearly all Covered Persons, irrespective of medical necessity. All of the foregoing was intended to manipulate the payment formulas under the No-fault Law in order to maximize the charges that the DME Defendants could submit to Plaintiffs and other insurers under the No-fault Law.

17.    By way of further example and not limitation of Defendants' nearly identical parallel schemes to defraud, the Retail Owner Defendants, through their respective DME Defendants, submitted or caused to be submitted the same type of documentation in support of their claims for reimbursement, including, but not limited to, substantially similar delivery receipts and assignment of benefits forms, containing the same handwriting and typed notations. By way of example and not limitation, Exhibit "1" in the accompanying Compendium of Exhibits is a spreadsheet containing a representative sample of claims submitted by one or more of the DME Defendants containing substantially similar delivery receipts and/or assignment of benefits forms that were obviously based on a shared template.

18.    In carrying out the scheme to defraud, Defendants stole in excess of $117,000.00 from Plaintiffs by submitting, causing to be submitted or facilitating the submission of fraudulent claims for persons who allegedly sustained injuries covered by the New York State Comprehensive Motor Vehicle Insurance Reparations Act, Ins. Law §§ 5101, *et seq.* (popularly known as the "No-fault Law").

## STATUTORY/REGULATORY SCHEME

19.     Pursuant to the No-fault Law, Plaintiffs are required to pay, *inter alia*, for health service expenses that are reasonably incurred as a result of injuries suffered by occupants of their insured motor vehicles or pedestrians, which arise from the use or operation of such motor vehicles in the State of New York. Covered Persons can also assign these benefits to doctors and other properly licensed healthcare providers, including DME retailers, enabling them to bill insurance companies directly for their services.

20.     As alleged herein, Defendants exploited and continue to exploit this system by obtaining such assignments and billing Plaintiffs for Rental DME that was never provided, not provided as billed or, if provided, was otherwise medically unnecessary and provided pursuant to fraudulent prescriptions in conformity with a predetermined course of treatment in which virtually all Covered Persons received the same DME. Exhibit "2" in the accompanying Compendium of Exhibits is a representative sample of claims paid by Plaintiffs to Defendants for medical equipment provided pursuant to fraudulent prescriptions based upon a predetermined course of treatment, irrespective of medical necessity.

21.     The DME Defendants are ostensibly DME supply companies that bill for medical supplies provided to, among others, individuals covered under the No-fault Law. In exchange for its services, the DME Defendants accepted (and continue to accept) assignments of benefits from Covered Persons and submitted (and continue to submit) claims for payment to No-fault insurance carriers, in general, and to Plaintiffs, in particular.

22.     In accordance with the No-fault Law and 11 N.Y.C.R.R. §§ 65 *et seq*., the DME Defendants submitted (and continue to submit) claims to Plaintiffs using the claim forms prescribed by the New York State Department of Financial Services ("DFS," f/k/a the Department

of Insurance), including the "No-Fault Assignment of Benefits Form" or form "NF-AOB" and a bill in the form of the "Verification of Treatment by Attending Physician or Other Provider of Health Service" or "NYS form NF-3" (hereinafter "NF-3"), or a substantially similar form (such as the "Health Insurance Claim Form" or "CMS Form 1500").

23.     At all relevant times mentioned herein, pursuant to Section 403 of the New York State Insurance Law, the claim forms submitted to Plaintiffs by the DME Defendants contained the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for commercial insurance or statement of claim for any commercial or personal insurance benefits containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto…commits a fraudulent insurance act, which is a crime….

24.     At all relevant times mentioned herein, the DME Defendants identified the DME it purportedly provided to Covered Persons on the claim forms using Healthcare Common Procedure Coding System (HCPCS) Level II Codes, a standardized coding system maintained by the Centers for Medicare & Medicaid Services (CMS) used to identify services not identified in the American Medical Association's Current Procedural Terminology (CPT) code set, including, *inter alia,* durable medical equipment and orthotic devices.

25.     At all relevant times mentioned herein, pursuant to the No-fault Law and implementing regulations, as well as the applicable policies of insurance, Plaintiffs were (and are) required to promptly process claims within 30 days of receipt of proof of claim.

26.      At all relevant times mentioned herein, Section 5108 of the No-fault Law circumscribes the amount that a licensed healthcare provider or other authorized person, such as a DME provider, may recover for health service-related expenses. Under this section, such persons are only entitled to reimbursement of necessary medically related expenses in accordance with the

applicable fee schedules established by the Chairman of the Workers' Compensation Board and adopted by the Superintendent of the DFS.

27.     By Opinion Letter dated June 16, 2004, entitled "No-Fault Fees for Durable Medical Equipment," the New York State Insurance Department recognized the harm inflicted on insureds by inflated DME charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

28.     At all relevant times mentioned herein, pursuant to Ins. Law § 5108, the Superintendent of the DFS adopted, by promulgation of Regulation 83, the Workers' Compensation Board ("WCB") Fee Schedules for determining the maximum permissible reimbursement amounts for which health care providers may charge for services provided to Covered Persons under the No-fault Law. 11 N.Y.C.R.R. § 68.1.

29.     At all relevant times mentioned herein, Regulation 83 did not adopt the Workers' Compensation Fee Schedules with respect to "workers' compensation claim forms, pre-authorization approval, time limitations within which health services must be performed, enhanced reimbursement for providers of certain designated services...."

30.     Effective June 7, 2021, the WCB adopted an official fee schedule for durable medical equipment, medical/surgical supplies, orthopedic footwear and orthotic and prosthetic appliances (hereinafter the "Fee Schedule"), 12 N.Y.C.R.R. § 442.2(a), which lists such devices by corresponding HCPCS Level II code.

31.     With respect to rental DME, at all relevant times mentioned herein, under the Fee Schedule, providers of rental DME are limited as follows:

> The maximum permissible monthly charge for the rental of durable medical equipment shall be the rental price listed in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule multiplied by the total number of months or weeks respectively for which the durable medical equipment is needed. In the event the total rental charge exceeds the purchase price, the maximum permissible charge for the durable medical equipment shall be the purchase price listed in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule, whether or not the claimant keeps the durable medical equipment or returns it when no longer needed.

12 N.Y.C.R.R. § 442.2(a)(2).

32.     At all times relevant herein with respect to DME and orthotic devices either not listed on the Fee Schedule, or listed on the Fee Schedule without being assigned a maximum reimbursement for purchase, rental or both, Part E to Regulation 83 states as follows:

**Part E. Durable medical equipment fee schedule.**

(a) This Part shall apply to durable medical equipment not listed in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule and to durable medical equipment listed in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule for which no fee for purchase, rental, or both has been assigned.

(b) As used in this Part, acquisition cost means the line-item cost to the provider from a manufacturer or wholesaler net of any rebates, discounts or valuable consideration, mailing, shipping, handling, insurance costs or sales tax.

(c) The maximum permissible purchase charge for such durable medical equipment shall be the lesser of the:

  (1)    acquisition cost plus 50%; or

  (2)    usual and customary price charged by durable medical equipment providers to the general public.

(d) (1) On and after June 1, 2023, the maximum permissible monthly rental charge for such durable medical equipment shall be one-tenth of the acquisition cost to the provider. Rental charges for less than one month shall be calculated on a pro-rata basis using a 30-day month.

     (2)    The total accumulated rental charge for such durable medical equipment shall be the least of the:

         (i)     acquisition cost plus 50%;

         (ii)    usual and customary price charged by durable medical equipment providers to the general public; or

         (iii)   purchase fee for such durable medical equipment established in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule.

https://www.dfs.ny.gov/system/files/documents/2023/02/rf_ins_83_amend36_text.pdf.

33.    Accordingly, at all relevant times mentioned herein for Rental DME, DME and/or orthotic devices, providers of DME are entitled to reimbursement in the amounts set forth in the Fee Schedule. At all relevant times mentioned herein, with respect to Rental DME, DME and/or orthotic devices that are not listed on the Fee Schedule and/or listed on the Fee Schedule but for which no fee has been assigned (hereinafter "Non-Fee Schedule" items), the maximum permissible reimbursement shall be one tenth of such items acquisition cost for items dispensed on or after June 1, 2023, and at all times relevant herein, not to exceed the amount determined by application of the lesser of standard as reflected in 11 N.Y.C.R.R. § App.17-C Part E.

34.    At all relevant times mentioned herein, pursuant to Section 5108(c) of the No-fault Law, "no provider of health services . . . may demand or request any payment in addition to the charges authorized pursuant to this section."

35.    Moreover, to be eligible for reimbursement under the No-fault Law during all relevant times mentioned herein, all claims for reimbursement must include a description of the "full particulars of the nature and extent of the . . . treatment received," including DME. *See* 11 N.Y.C.R.R. § 65-1.1.

36.    At all relevant times mentioned herein, nearly each and every bill mailed or caused to be mailed to Plaintiffs by the Retail Owner Defendants, through their respective DME Defendants, sought reimbursement in excess of the amounts authorized by the No-fault Law, by

materially misrepresenting the Rental DME provided, if provided at all, as well as the nature, quality, and medical necessity of the billed-for Rental DME. To the extent the Rental DME was provided at all, each item was medically unnecessary because it was provided pursuant to a predetermined course of treatment, irrespective of medical need, and was billed in an amount far in excess of what the DME Defendants were entitled to be reimbursed.

37.     On information and belief, in furtherance of the scheme to defraud alleged herein, the DME Defendants as a matter of pattern, practice, and protocol, routinely provided Covered Persons with expensive Rental DME that was medically unnecessary and provided as part of an elaborate kickback scheme for unnecessary referrals in order to maximize reimbursement.

38.     As part of a fraudulent protocol of treatment, in addition to receiving a standard battery of medical treatment, including the provision of several pieces of DME such as bed boards, cervical pillows, cervical collars, cervical traction units, cold/hot water circulating pumps, TENS units, hot/cold packs, infrared heat lamps, whirlpools, lumbar cushions, mattresses, orthopedic car seats, ultrasound devices, electromagnetic devices, and/or compression devices from other DME retailers, the DME Defendants delivered expensive pain management Rental DME to Covered Persons that were not medically necessary and/or were provided pursuant to a kickback arrangement or for other financial consideration. In some cases, Covered Persons received an MWT Device, Cervical EMTT Device, and a Cold Compression/Cryotherapy Device from the DME Defendants, each a medically unnecessary item, purportedly billed for at $2,428.00, $2,788.00, $2,299.00 and $4,250.00, respectively, as part of the scheme to financially enrich the DME Defendants, through a fraudulent protocol of treatment, all while significantly diminishing the coverage available for medically necessary services, to the extent the Covered Persons were actually injured and in need of treatment.

39.    On information and belief, every aspect of Defendants' fraudulent scheme was motivated by money, without regard to the grave harm inflicted on the public at large by the Defendants, who, to the extent that they provided any Rental DME at all, provided Covered Persons with inferior, low-quality items, or items that directly contravened the treatment plan indicated by the treating physicians, potentially compromising Covered Persons' health.

40.    The duration, scope and nature of the Defendants' illegal conduct bring this case well within the realm of criminal conduct to which the Racketeer Influenced and Corrupt Organizations Act ("RICO") applies. Defendants did not engage in sporadic acts of fraud—although that would be troubling enough—rather, they adopted fraudulent blueprints as their business plans and used them to participate in systematic patterns of racketeering activity. Every facet of Defendants' operations, from securing fraudulent prescriptions for DME pursuant to a predetermined course of treatment, that misrepresented the medical necessity for the Rental DME purportedly provided, to obtaining fraudulent wholesale invoices, that misrepresented the nature, quality and cost of Rental DME purportedly provided, was carried out for the purpose of committing fraud.

41.    This lawsuit seeks to, among other things, enforce the plain language of the No-fault Law and implementing regulations, as well as its underlying public policy, which limits reimbursement of No-fault benefits to legitimate insurance claims for DME and/or orthotic devices. In doing so, Plaintiffs seek compensatory damages and declaratory relief that Plaintiffs are not required to pay any of the DME Defendants' No-fault claims because the Retail Owner Defendants, through their respective DME Defendants, submitted (1) false and fraudulent insurance claims for medically unnecessary Rental DME to Plaintiffs deliberately misrepresenting the amounts they were entitled to be reimbursed; and/or (2) false and fraudulent insurance claims

to Plaintiffs for Rental DME that, to the extent anything was provided at all, was provided pursuant to a predetermined protocol of treatment without regard to medical necessity. Such claims continue to be submitted by and/or in the name of the DME Defendants and are, or can be, the subject of No-fault collection actions and/or arbitrations to recover benefits, and thus, constitute a continuing harm to Plaintiffs.

42.    By way of example and not limitation, Exhibit "3" in the accompanying Compendium of Exhibits is a spreadsheet listing a representative sample of more than $395,000.00 of unpaid No-fault claims that form the basis of Plaintiffs' request for declaratory relief.

## NATURE OF THE ACTION

43.    This action is brought pursuant to:

i)    The United States Racketeer Influenced and Corrupt Organizations Act ("RICO"); 18 U.S.C. §§ 1961, 1962(c) and 1964(c);

ii)    New York State common law; and

iii)    The Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

## NATURE OF RELIEF SOUGHT

44.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs seek treble damages, which they sustained as a result of the Defendants' scheme to defraud and acts of mail fraud in connection with their use of the facilities of the No-fault system to fraudulently obtain payments from Plaintiffs for Rental DME and accompanying accessories they allegedly provided to individuals covered by Plaintiffs under New York State's No-fault Law.

45.    Plaintiffs further seek a judgment declaring that they are under no obligation to pay any of the DME Defendants' unpaid No-fault claims because:

i)    The Retail Owner Defendants, through their respective DME Defendants, made false and fraudulent misrepresentations in the bills and supporting

documentation submitted to Plaintiffs to obtain reimbursement far in excess of the maximum permissible amount they could submit to Plaintiffs; and/or

ii)    The Retail Owner Defendants, through their respective DME Defendants, made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs seeking reimbursement for Rental DME that were provided pursuant to a predetermined protocol of treatment without regard to medical necessity.

46.    As a result of Defendants' actions alleged herein, Plaintiffs were defrauded of an amount in excess of $117,000.00, the exact amount to be determined at trial, in payments which Defendants received for fraudulently billing Plaintiffs for Rental DME that were never provided or, if provided, not provided as billed and/or provided pursuant to fraudulent prescriptions in accordance with a predetermined course of treatment, irrespective of medical need.

## THE PARTIES

A.    **Plaintiffs**

47.    Plaintiff Allstate Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

48.    Plaintiff Allstate Fire and Casualty Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

49.    Plaintiff Allstate Indemnity Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

50.    Plaintiff Allstate Property and Casualty Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

51.    Plaintiffs are duly organized and licensed to engage in the writing of automobile insurance policies in the State of New York and provide automobile insurance coverage to their policyholders under and in accordance with New York State law.

**B.    The Individual Retail Owner Defendants**

52.    Mykola Haidarzhy is a natural person residing in the State of Florida, is the principal, officer, and/or director of Retail Defendant Leaf One Supply Inc., and, at all times relevant herein, operated, managed, and/or controlled its activities.

53.    Haidarzhy directly participated in scheme to defraud alleged herein by (i) operating and managing the affairs of Leaf One Supply, (ii) obtaining and establishing or directing the obtainment and establishment of referrals sources to ensure a steady flow of prescriptions of Rental DME and orthotic devices submitted through Leaf One Supply to insurers in general, and Plaintiffs in particular, in support of the fraudulent No-fault claims; (iii) ordering and maintaining and/or directing the ordering and maintaining of the inventory of bogus Rental DME and orthotic devices purportedly dispensed by Leaf One Supply to Covered Persons in connection with a fraudulent predetermined protocol of treatment; (iv) directing and causing the purported delivery of Rental DME and orthotic devices purportedly dispensed, if at all, by Leaf One Supply to Covered Persons in connection with a fraudulent predetermined protocol of treatment; (v) creating and fabricating and/or causing the creation and fabrication of the documents/forms submitted through Leaf One Supply to insurers in general, and Plaintiffs in particular, in support of the fraudulent No-fault claims; (vi) determining and directing the documents to be submitted to insurers in general, and Plaintiffs in particular, in support of Leaf One Supply's fraudulent No-fault Claims; (vii) determining and directing the false billing codes and price information to be used on Leaf One Supply's claim submissions to insurers in general, and Plaintiffs in particular; and (viii) mailing

or causing the mailing of fraudulent No-fault claims for reimbursement through Leaf One Supply, to insurers in general, and Plaintiffs in particular, for DME and/or orthotic devices prescribed and dispensed by Leaf One Supply, to the extent they are dispensed at all, in connection with a predetermined protocol of treatment irrespective of medical necessity.

54.    Iryna Yakubiak is a natural person residing in the State of Illinois, is the principal, officer, and/or director of Retail Defendant Gate Supply Inc., and, at all times relevant herein, operated, managed, and/or controlled its activities.

55.    Yakubiak directly participated in scheme to defraud alleged herein by (i) operating and managing the affairs of Gate Supply, (ii) obtaining and establishing or directing the obtainment and establishment of referrals sources to ensure a steady flow of prescriptions of Rental DME and orthotic devices submitted through Gate Supply to insurers in general, and Plaintiffs in particular, in support of the fraudulent No-fault claims; (iii) ordering and maintaining and/or directing the ordering and maintaining of the inventory of bogus Rental DME and orthotic devices purportedly dispensed by Gate Supply to Covered Persons in connection with a fraudulent predetermined protocol of treatment; (iv) directing and causing the purported delivery of Rental DME and orthotic devices purportedly dispensed, if at all, by Gate Supply to Covered Persons in connection with a fraudulent predetermined protocol of treatment; (v) creating and fabricating and/or causing the creation and fabrication of the documents/forms submitted through Gate Supply to insurers in general, and Plaintiffs in particular, in support of the fraudulent No-fault claims; (vi) determining and directing the documents to be submitted to insurers in general, and Plaintiffs in particular, in support of Gate Supply's fraudulent No-fault Claims; (vii) determining and directing the false billing codes and price information to be used on Gate Supply claim submissions to insurers in general, and Plaintiffs in particular; and (viii) mailing or causing the mailing of fraudulent No-

fault claims for reimbursement through Gate Supply, to insurers in general, and Plaintiffs in particular, for DME and/or orthotic devices prescribed and dispensed by Gate Supply, to the extent they are dispensed at all, in connection with a predetermined protocol of treatment irrespective of medical necessity

56. Nazar Petruk is a natural person residing in the State of Illinois, is the principal, officer, and/or director of Retail Defendant Tara Supply Inc., and, at all times relevant herein, operated, managed, and/or controlled its activities.

57. Petruk directly participated in scheme to defraud alleged herein by (i) operating and managing the affairs of Tara Supply, (ii) obtaining and establishing or directing the obtainment and establishment of referrals sources to ensure a steady flow of prescriptions of Rental DME and orthotic devices submitted through Tara Supply to insurers in general, and Plaintiffs in particular, in support of the fraudulent No-fault claims; (iii) ordering and maintaining and/or directing the ordering and maintaining of the inventory of bogus Rental DME and orthotic devices purportedly dispensed by Tara Supply to Covered Persons in connection with a fraudulent predetermined protocol of treatment; (iv) directing and causing the purported delivery of Rental DME and orthotic devices purportedly dispensed, if at all, by Tara Supply to Covered Persons in connection with a fraudulent predetermined protocol of treatment; (v) creating and fabricating and/or causing the creation and fabrication of the documents/forms submitted through Tara Supply to insurers in general, and Plaintiffs in particular, in support of the fraudulent No-fault claims; (vi) determining and directing the documents to be submitted to insurers in general, and Plaintiffs in particular, in support of Tara Supply's fraudulent No-fault Claims; (vii) determining and directing the false billing codes and price information to be used on Tara Supply claim submissions to insurers in general, and Plaintiffs in particular; and (viii) mailing or causing the mailing of fraudulent No-

fault claims for reimbursement through Tara Supply, to insurers in general, and Plaintiffs in particular, for DME and/or orthotic devices prescribed and dispensed by Tara Supply, to the extent they are dispensed at all, in connection with a predetermined protocol of treatment irrespective of medical necessity.

## C.    **The DME Defendants**

58.    Leaf One Supply Inc. ("Leaf One Supply") was formed on or about August 13, 2024, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 96-09 Springfield Boulevard, Suite 201, Queens Village, New York 11429. Leaf One Supply is operated, managed, and/or controlled by Defendant Haidarzhy and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME under the No-fault Law.

59.    Gate Supply Inc. ("Gate Supply") was formed on or about July 9, 2024, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 1492 Richmond Road, Ground Floor, Staten Island, New York 10304. Gate Supply is operated, managed, and/or controlled by Defendant Yakubiak and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME under the No-fault Law.

60.    Tara Supply Inc. ("Tara Supply") was formed on or about August 20, 2024, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 1535 Decatur Street, Suite 28, Ridgewood, New York 11385. Tara Supply is operated, managed, and/or controlled by Defendant Petruk and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME under the No-fault Law.

D.    **The John Doe Defendants**

61.    On information and belief, John Does 1 through 5 are individuals that are unknown to Plaintiff, who conspired, participated, conducted, and assisted in the fraudulent and unlawful conduct alleged herein. These individuals will be added as defendants when their names and the extent of their participation become known through discovery.

E.    **The ABC Corporations**

62.    On information and belief, the ABC Corporations 1 through 5 are additional companies that are unknown to Plaintiff that are owned, controlled, and operated by one or more of the John Doe Defendants, which were used in connection with the kickback scheme with the Defendants alleged herein to obtain referrals, prescriptions and/or Covered Persons in furtherance of the scheme. These ABC Corporations 1 through 5 will be added as defendants when their names and the full extent of their participation become known through discovery.

## JURISDICTION AND VENUE

63.    Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the claims brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq*. because they arise under the laws of the United States.

64.    This Court also has jurisdiction over the subject matter of this action under 28 U.S.C. § l332 because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

65.    This Court also has supplemental jurisdiction over the claims arising under state law pursuant to 28 U.S.C. § 1367(a).

66.    Pursuant to 18 U.S.C. § 1965, 28 U.S.C. § 1367 and New York CPLR § 302(a), this Court has personal jurisdiction over any non-domiciliary defendant.

67.     Venue lies in this District Court under the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b) as the Eastern District of New York is the district where one or more the Defendants reside and because this is the district where a substantial amount of the activities forming the basis of the Complaint occurred.

## FACTUAL BACKGROUND AND ALLEGATIONS
## APPLICABLE TO ALL CAUSES OF ACTION

68.     Plaintiffs underwrite automobile insurance in New York State and participate as insurers in New York State's No-fault program.

69.     As set forth in the Statutory/Regulatory Scheme section above, pursuant to the No-fault Law, Plaintiffs are required to pay for, *inter alia*, health service expenses that are reasonably incurred as a result of injuries suffered by occupants of their insured motor vehicles and pedestrians that arise from the use or operation of such motor vehicles in the State of New York.

70.     The DME Defendants are ostensibly DME supply companies that bill for medical supplies provided to, among others, individuals covered under the No-fault Law. In exchange for its services, the DME Defendants accept assignments of benefits from Covered Persons covered under the No-fault Law and submit claims for payment to No-fault insurance carriers, in general, and to Plaintiffs, in particular.

71.     To process and verify the claims submitted by the DME Defendants, Plaintiffs required, and the DME Defendants submitted, prescriptions and other documents relating to the Rental DME allegedly supplied to Covered Persons for which the DME Defendants was seeking reimbursement from Plaintiffs.

72.     In nearly all instances, the prescriptions submitted in support of the DME Defendants' claims for reimbursement were fraudulent, fabricated, duplicated and/or issued pursuant to a pre-determined treatment protocol, regardless of medical necessity.

73.     At all relevant times mentioned herein, in each bill submission to No-fault insurers in general, and Plaintiffs in particular, the DME Defendants made the following representations to each recipient:

- The bills for Rental DME were based on a valid prescription by a healthcare practitioner licensed to issue such prescriptions;

- The prescriptions for Rental DME were not issued pursuant to any unlawful financial arrangements;

- The Rental DME identified on the bills were actually provided to the Covered person based on a valid prescription identifying medically necessary items;

- The billing codes used on the bills actually represent the DME and all included services that was provided to the Covered Person; and

- The fees sought for the billed for Rental DME did not exceed that permissible under the No-fault law and regulations.

74.     Pursuant to the No-fault Law and implementing regulations, as well as the applicable policies of insurance, Plaintiffs are required to promptly process the DME Defendants' claims within 30 days of receipt of proof of claim.

75.     To fulfill their obligation to promptly process claims, Plaintiffs justifiably relied upon the bills and documentation submitted by the DME Defendants, in support of its claims, and paid the DME Defendants based on the representations and information contained in the bills and documentation that Defendants mailed to Plaintiffs.

76.     At all relevant times mentioned herein, the No-fault Law provides that the maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies and orthotic and prosthetic appliances is the fee payable for such equipment and supplies under the relevant fee schedule established by the Worker's Compensation Board, as adopted by the Superintendent of the DFS. N.Y. Ins. Law § 5108; 11 N.Y.C.R.R. 68.1(a).

77.    At all relevant times mentioned herein, the Worker's Compensation Board has adopted a fee schedule setting forth the maximum reimbursement amounts and rates for DME and orthotic devices. 12 N.Y.C.R.R. § 442.2.

78.    At all times mentioned herein, for Fee Schedule rental DME, the fee payable shall be:

> The maximum permissible monthly charge for the rental of durable medical equipment shall be the rental price listed in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule multiplied by the total number of months or weeks respectively for which the durable medical equipment is needed. In the event the total rental charge exceeds the purchase price, the maximum permissible charge for the durable medical equipment shall be the purchase price listed in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule, whether or not the claimant keeps the durable medical equipment or returns it when no longer needed.

12 N.Y.C.R.R. § 442.2(a)(2).

79.    At all times relevant herein with respect to DME and orthotic devices either not listed on the Fee Schedule, or listed on the Fee Schedule without being assigned a maximum reimbursement for purchase, rental or both, Part E to Regulation 83 states as follows:

**<u>Part E. Durable medical equipment fee schedule.</u>**

(a) This Part shall apply to durable medical equipment not listed in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule and to durable medical equipment listed in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule for which no fee for purchase, rental, or both has been assigned.

(b) As used in this Part, acquisition cost means the line-item cost to the provider from a manufacturer or wholesaler net of any rebates, discounts or valuable consideration, mailing, shipping, handling, insurance costs or sales tax.

(c) The maximum permissible purchase charge for such durable medical equipment shall be the lesser of the:

(1)    acquisition cost plus 50%; or

(2)    usual and customary price charged by durable medical equipment providers to the general public.

(d) (1) On and after June 1, 2023, the maximum permissible monthly rental charge for such durable medical equipment shall be one-tenth of the acquisition cost to the provider. Rental charges for less than one month shall be calculated on a pro-rata basis using a 30-day month.

(2) The total accumulated rental charge for such durable medical equipment shall be the least of the:

(i) acquisition cost plus 50%;

(ii) usual and customary price charged by durable medical equipment providers to the general public; or

(iii) purchase fee for such durable medical equipment established in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule.

https://www.dfs.ny.gov/system/files/documents/2023/02/rf_ins_83_amend36_text.pdf.

80.     Accordingly, at all relevant times mentioned herein to the extent providers of DME are entitled to reimbursement for Fee Schedule items, such items would be reimbursable in the amounts set forth in the Fee Schedule. At all relevant times mentioned herein, for Non-Fee Schedule items, the maximum permissible reimbursement shall be one tenth of such items acquisition cost for items dispensed on or after June 1, 2023, and at all times relevant herein, not to exceed the amount determined by application of the lesser of standard as reflected in 11 N.Y.C.R.R. § App.17-C Part E.

81.     The DME Defendants were created in connection with an elaborate scheme to fraudulently bill No-fault insurance carriers for DME that was never provided, were not provided as billed or, if provided, were otherwise medically unnecessary and provided pursuant to a predetermined course of treatment in which virtually all Covered Persons received the same battery of Rental DME.

82.     The Rental DME that the DME Defendants purported to provide, and for which it billed Plaintiffs, seldom varied from Covered Person-to-Covered Person over a given period of time and also did not change based on any differences in the Covered Persons' condition, age,

complaints, type of accident, or nature of alleged injury. Instead, the Retail Owner Defendants, through their respective DME Defendants, created a billing apparatus which implemented a portion of a pre-determined treatment protocol that was designed to drain the maximum amount of dollars from insurance companies for each and every Covered Person, including those who required little or no DME at all.

83.     The Retail Owner Defendants created and controlled their respective DME Defendants, which were part of well-organized illegal enterprises that engaged in pervasive fraudulent practices that distinguished each from legitimate providers of Rental DME. The components of the enterprises followed practices that were part of a racketeering scheme dictated by the Retail Owner Defendants, including, but not limited to, one or more of the following practices:

- Unlike legitimate retail DME companies, the Retail Owner Defendants, through their respective DME Defendants, misrepresented the nature and type of Rental DME purportedly provided to Covered Persons;

- Unlike legitimate retail DME companies, the Retail Owner Defendants, through their respective DME Defendants, submitted bills to Plaintiffs misrepresenting the amounts they were entitled to be reimbursed under the No-fault Law;

- Unlike legitimate retail DME companies, the Retail Owner Defendants, through their respective DME Defendants, submitted prescriptions, bills, and delivery receipts to Plaintiffs for Rental DME that generically described the item(s) so as to conceal the type of item(s) being prescribed and/or provided;

- Unlike legitimate retail DME companies, the Retail Owner Defendants, through their respective DME Defendants, submitted bills to Plaintiffs for DME that was never provided to Covered Persons;

- Unlike legitimate retail DME companies, the Retail Owner Defendants, through their respective DME Defendants, concealed the fact that the DME were prescribed and supplied pursuant to a pre-determined, fraudulent protocol pursuant to a kickback or other financial arrangement with No-fault Clinics;

- Unlike legitimate retail DME companies, the Retail Owner Defendants, through their respective DME Defendants, arranged to have prescriptions

for Rental DME delivered to them directly by the No-fault Clinics and/or HCPs, rather than allowing the Covered Persons to select their DME supply company;

- Unlike legitimate retail DME companies, the Retail Owner Defendants, through their respective DME Defendants, and/or those acting under their direction and control, had agreements and/or understandings as to what Rental DME would be prescribed by the No-fault Clinics; and

- Unlike legitimate retail DME companies, the Retail Owner Defendants, through their respective DME Defendants, entered into illicit relationships with the No-fault Clinics, which, in exchange for kickbacks and/or a fee, provided the DME Defendants with prescriptions and/or referrals for Rental DME pursuant to a predetermined course of treatment, irrespective of medical necessity.

84. In these and numerous other ways, Defendants sought to deceive Plaintiffs into paying fraudulent claims that typically exceeded several thousands of dollars per Covered Person.

85. Haidarzhy, as a member of the Leaf One Supply enterprise, Yakubiak, as a member of the Gate Supply enterprise, and Petruk, as a member of the Tara Supply enterprise, as alleged herein, played well-defined and essential roles in the Defendants' scheme to defraud and in directing the affairs of the enterprises. By way of example and not limitation, in furtherance of their scheme to defraud, on information and belief, the Retail Owner Defendants engaged in one or more the following:

- Entered into  financial arrangements with No-fault Clinics, not named as defendants in this action, to (i) ensure that their HCPs generated large volumes of prescriptions for identical Rental DME to their Covered Person population, and/or (ii) fabricate prescriptions issued by the HCPs, in order to bill insurers, in general, and Plaintiffs in particular, pursuant to a predetermined course of treatment, irrespective of medical necessity;

- Entered into financial arrangements with wholesalers including, but not limited to, Daytona Recovery, not named a defendant in this action, in which Daytona Recovery supplied one or more of the DME Defendants with inexpensive and/or cheap knockoff items of expensive medical equipment and generated wholesale invoices which grossly inflated the amounts the DME Defendants paid for the Rental DME in order for the DME Defendants to exploit and manipulate the payment formulas under the No-fault Law and implementing regulations to maximize the charges that they could submit to Plaintiffs;

- Ordered and maintained the inventory of bogus Rental DME and orthotic devices purportedly dispensed to Covered Persons in connection with a fraudulent predetermined protocol of treatment;

- Directed and/or caused the purported delivery of Rental DME and orthotic devices purportedly dispensed, if at all, to Covered Persons in connection with a fraudulent predetermined protocol of treatment;

- Caused the creation and/or fabrication of the documents/forms submitted through their respective DME Defendants to insurers in general, and Plaintiffs in particular, in support of the fraudulent No-fault claims;

- Submitted or caused to be submitted, on behalf of the DME Defendants, numerous fraudulent claim forms seeking payment for DME that was purportedly (but not actually) provided to many Covered Persons;

- Submitted or caused to be submitted, on behalf of the DME Defendants, numerous fraudulent claim forms seeking payment for Rental DME that were purportedly (but not actually) provided to many Covered Persons;

- Submitted or caused to be submitted, on behalf of the DME Defendants, prescription forms in support of requests for payment for Rental DME, which they knew to be fabricated;

- Prepared or caused to be prepared fraudulent bills to be mailed to Plaintiffs, through their respective DME Defendants; and/or

- Mailed or caused those acting under their direction to mail bogus claims, through their respective DME Defendants, to Plaintiffs, knowing that they contained materially false and misleading information.

86.    At all relevant times mentioned herein,  Defendants knew that the prescriptions provided by the No-fault Clinics were fraudulent in that they were issued pursuant to a fraudulent treatment protocol at the No-fault Clinic in connection with an unlawful referral and/or kickback scheme for medically unnecessary Rental DME.

87.    At all relevant times mentioned herein, the Retail Owner Defendants, directly or through others acting under and pursuant to their direction, instruction, and control, submitted or caused to be submitted the fraudulent prescription and/or claim forms through and in the name of their respective DME Defendants, to Plaintiffs, in furtherance of the scheme to defraud alleged herein, to obtain payment in connection with fraudulent claims.

88.    At all relevant times mentioned herein, the Retail Owner Defendants and the No-fault Clinics, acting in concert with each other, participated in, conducted, controlled, conspired together, aided and abetted and furthered the fraudulent schemes through a common course of conduct and purpose, which was to defraud insurers, in general, and Plaintiffs, in particular, of money.

## THE MECHANICS OF THE SCHEME TO DEFRAUD

89.    Beginning in July 2024, and continuing until the present day, Defendants and others not named in this action have engaged in a systematic fraudulent billing scheme based upon the alleged provision of Rental DME to Covered Persons.

90.    At all relevant times mentioned herein, the Retail Owner Defendants incorporated, formed, owned and/or controlled the DME Defendants for the purpose of defrauding insurers, in general, and Plaintiffs, in particular.

91.    The Retail Owner Defendants, through their respective DME Defendants, engaged in a pervasive scheme to defraud, wherein the Retail Owner Defendants: (i) paid kickbacks to the No-fault Clinics in exchange for prescriptions of Rental DME; (ii) obtained prescriptions that were provided pursuant to a predetermined course of treatment, without regard to medical necessity; (iii) obtained and submitted to insurers, in general, and Plaintiffs, in particular, prescriptions which they knew to be fabricated and/or fraudulently altered and/or duplicated; (iv) arranged for the No-fault Clinics to have assignments of benefits forms and delivery receipt forms signed by Covered Persons on their behalf to ensure that they had all of the documents necessary to submit claims to insurers, in general, and Plaintiffs, in particular; (v) obtained inflated and otherwise fraudulent wholesale invoices from one or more non-party sham wholesalers, including, but not limited to, Daytona Recovery, that the DME Defendants, in turn, would use to substantiate bogus claims for

reimbursement of No-fault benefits and; (vi) systematically submitted bills to insurers, in general, and Plaintiffs, in particular, for Rental DME that were purportedly provided to Covered Persons based on medical necessity when, in fact, the Retail Owner Defendants, through their respective DME Defendants, along with one or more of Defendants John Does 1 through 5, determined the Rental DME that would be prescribed by the same HCPs at the No-fault Clinics, with virtually every Covered Person receiving the same Rental DME regardless of medical necessity.

92.     The DME Defendants were sham entities that were opened and used to bill for only a short few months at a time as quick-strike providers of expensive Rental DME in order to maximize reimbursement without regard to medical necessity before being closed down. In fact, Leaf One Supply billed for Rental DME allegedly provided over an approximate three-month period. Gate Supply billed for Rental DME allegedly provided over an approximate seven-month period. Tara Supply billed for Rental DME allegedly provided over an approximate eight-month period. Notwithstanding, Defendants' attempts to collect on unpaid bills continue to the time of the filing of this complaint.

93.     In addition, the DME Defendants each lacked any accessible retail location, each lacked any genuine office location, each had no internet website or online footprint, and each operated without advertising or marketing to the general public or without making any legitimate efforts to attract patients or customers who might need medical equipment.

94.     By way of example and not limitation, Leaf One Supply is purportedly located at 96-09 Springfield Boulevard, Suite 201, Queens Village, New York 11429, a commercial property that appears to contain, among other things, a dental office, a tabernacle, an event space and a law office. However, there is no evidence that a medical supply company operated there.

95.     By way of further example and not limitation, Gate Supply is purportedly located at 1492 Richmond Road, Ground Floor, Staten Island, New York 10304, a property containing a single-family residence that does not appear to show any sign that a medical supply company operated there.

96.     By way of further example and not limitation, Tara Supply is purportedly located at 1535 Decatur Street, Suite 28, Ridgewood, New York 11385, a property containing what appears to be a mixed commercial and residential building that does not appear to contain a "Suite 28" or show any sign of a medical supply company operating there.

97.     Defendants devised and carried out a scheme to fraudulently bill insurers, in general, and Plaintiffs, in particular, for expensive Rental DME that was never provided, or if provided, was provided pursuant to fraudulent prescriptions based upon a pre-determined treatment protocol, irrespective of medical necessity, materially misrepresented in their fraudulent bill submissions to Plaintiffs.

98.     Regardless of whether a Covered Person was seen by a doctor on the date of the initial office visit at any of the unnamed No-fault Clinics operating in the New York metropolitan area, a Covered Person's initial office consultation would automatically trigger a series of internal practices and procedures in which the No-fault Clinics, in exchange for kickbacks and/or other financial compensation agreements, would issue a prescription for a standard battery of Rental DME, pursuant to a standard protocol or predetermined course of treatment and regardless of whether such items were medically necessary.

99.     Such prescriptions are issued for virtually every Covered Person, regardless of factors such as their age, height, weight, prior medical history, position in the vehicle and/or purported involvement in an accident.

100.    As part of the scheme to defraud described herein, pursuant to kickbacks or other financial compensation agreements with one or more of the Retail Defendants, the No-fault Clinics arranged for the fraudulent prescriptions to be issued to the DME Defendants by: (i) causing their HCPs to write Rental DME prescriptions in accordance with a pre-determined protocol; (ii) fabricating and/or falsifying Rental DME prescriptions; and/or (iii) ensuring that the prescriptions were sufficiently generic so that the nature and type of any Rental DME could not be verified based on the description of the prescribed item alone.

101.    In furtherance of the scheme to defraud alleged herein, each of the DME Defendants routinely submitted to Plaintiffs bills for the Rental DME based upon fraudulent, pre-printed prescription forms purportedly issued by the same No-fault Clinics and associated HCPs. In that regard, the prescriptions were issue by amongst others, Kyungsook Bu, FNP (not named as a defendant in the Complaint), of AA Comprehensive Medical Care P.C. (not named as a defendant in the Complaint); and Robert Drazic, DO (not named as a defendant in the complaint), of Tri-Borough NY Medical Practice P.C. (not named as a defendant in the Complaint), Anjani Sinha, MD (not named as a defendant in the complaint), of Atlantic Medical & Diagnostic, P.C. (not named as a defendant in the Complaint). Moreover, the prescriptions issued by Kyungsook Bu, FNP and Robert Drazic, DO were, on information and belief, completely fabricated containing photocopied or stamped signatures on pre-printed forms. By way of example and not limitation:

**Prescriptions from Kyungsook Bu, FNP to Gate Supply Inc.**

Dated 10/29/2024
Covered Person R.O.
Claim No.
0774079750-02

Dated 09/18/2024
Covered Person S.H.
Claim No.
0769552505-06

Dated 09/23/2024
Covered Person S.R.
Claim No.
0768963472-02

Dated 10/17/2024
Covered Person C.T.
Claim No.
0772597778-01

**Prescriptions from Robert Drazic, DO to Leaf One Supply**

Dated 10/20/2024
Covered Person S.P.
Claim no.
0758338008-04

Dated 10/27/2024
Covered Person S.J.S.
Claim No.
0758999873-02

Dated 9/13/2024
Covered Person O.U,
Claim no.
0759960940-01

Dated 11/17/2024
Covered Person I.D.
Claim no.
0761003318-01



Dated 10/20/2024
Covered Person A.V.
Claim no.
0765039706-01



## Prescriptions from Kyungsook Bu, FNP to Tara Supply Inc.

Dated 10/07/2024
Covered Person D.G.
Claim No.
0772403325-01



Dated 10/17/2024
Covered Person C.T.
Claim No.
0772597778-01



Dated 09/26/2024
Covered Person S.R.
Claim No.
0768963472-02



Dated 09/18/2024
Covered Person S.H.
Claim no.
0769552505-06



34

102.    In furtherance of the scheme to defraud alleged herein, the No-fault Clinics did not provide the Covered Persons directly with the prescriptions for Rental DME. Instead, these prescriptions were given directly to the DME Defendants to eliminate the possibility that the Covered Person(s) would fill the prescription(s) with a legitimate retailer of DME.

103.    Furthermore, as part of the kickback or other financial compensation agreement with the No-fault Clinics and in furtherance of the scheme to defraud, on their first or second visit to the No-fault Clinic(s), the Covered Persons would be given a number of documents to complete and sign, including, but not limited to, assignment of benefit forms and one or more delivery receipts.

104.    In furtherance of the scheme to defraud and to maximize reimbursement from Plaintiffs, the DME Defendants routinely deliberately obscured identifying information relating to the billed-for Rental DME so as to prevent Plaintiffs from determining the appropriate charges associated with any such Rental DME or whether the specific Rental DME was medically necessary.

105.    Furthermore, as part of the scheme to defraud described herein, each of the DME Defendants routinely utilized pre-printed "Delivery Receipts," purportedly signed by the respective Covered Persons, containing a virtually identical format, print font, and language referring to the Rental DME, merely changing the name of the particular DME Defendant and Covered Person on each receipt.

106.    As a matter of pattern, practice, and protocol, the DME Defendants routinely provided Covered Persons with expensive MWT Devices, Cervical EMTT Devices, and Cold Compression/Cryotherapy Devices that were medically unnecessary and provided as part of an elaborate kickback scheme for unnecessary referrals to maximize reimbursement.

107.    In furtherance of the scheme to defraud alleged herein, though there were four different DME Defendants submitting bills to Plaintiffs for different Rental DME, the DME Defendants each used the same "miscellaneous" billing code – E1399, based on the fraudulent, pre-printed prescriptions allegedly issued by the HCPs, in many instances bearing their photocopied or stamped signatures.

108.    Furthermore, each of the four DME Defendants purportedly purchased, at exorbitant wholesale prices, the Rental DME from a single wholesaler, Daytona Recovery (not named as a defendant in the Complaint), which in turn, purportedly delivered the Rental DME directly to the DME Defendants at their phony office locations, each of which exhibited no capacity to actually receive the DME. By way of example and not limitation, Exhibit "4" in the accompanying Compendium of Exhibits is a representative sample of wholesale invoices purportedly issued by Daytona Recovery to the DME Defendants, which, in turn, were submitted by the DME Defendants.

109.    However, on information and belief, these invoices are a complete fabrication. Notably, Daytona Recovery has no actual business address, and its purported address of 35 Hayden Street, Unit 515, Toronto, Ontario, Canada, is listed as a one-bedroom, one-bathroom residential apartment in a luxury condominium building that cannot conceivably house a wholesale medical supply company. The invoice contains no serial number, no model number and is devoid of information that would allow an insurer to confirm the item purportedly provided.

110.    In furtherance of the scheme to defraud alleged herein, the Defendants utilized the phony common wholesale invoices from Daytona Recovery, the pre-printed prescription forms, and pre-printed delivery receipts to create the false appearance that the DME Defendants were legitimate companies entitled to reimbursement when, in fact, they were neither.

111.    In keeping with the predetermined fraudulent protocol of billing and treatment designed to maximize reimbursement in furtherance of the scheme to defraud described herein, the billing submissions of Gate Supply, and Tara Supply were mailed by the same billing/collection law firm in Franklin Square, New York. Further, the DME Defendants also used the same billing company – SDY Technologies LLC ("SDY") (not named as a defendant in the Complaint)– to submit their claims for reimbursement. SDY operates out of 185 Kingsland Street, Nutley, New Jersey 07110, the same address as Tri-Borough NY Medical Practice P.C. ("Tri-Borough") (not named as a defendant in the Complaint), a professional corporation in which Leonid Shapiro MD ("Shapiro") (not named as a defendant in the Complaint) is listed as the record owner. On information and belief, many of the fraudulent prescriptions originated from medical providers that were employed by or associated with Tri-Borough.

112.    In furtherance of the scheme to defraud and as part of the unlawful financial arrangements with the John Doe and/or ABC Corporations, in order to obtain fraudulent prescriptions for Rental DME purportedly issued by the referring HCPs, on information and belief, the Retail Defendants would pay thousands of dollars in kickbacks to the John Doe and/or ABC Corporation Defendants that, in some instances were fictitious businesses, existing for no legitimate purpose other than to facilitate the fraudulent scheme.

113.    On information and belief, pursuant to these unlawful financial arrangements, and in exchange for kickbacks and/or other financial compensation, including, but not limited to, a share in the profits of the scheme to defraud, the Retail Defendants entered into agreements with a wholesaler, Daytona Recovery, that provided the Retail Defendants with Rental DME along with fraudulent wholesale invoices that either grossly inflated the amounts the Retail Defendants paid for the Rental DME; or reflected Rental DME that was never actually provided to Retail

Defendants. In fact, irrespective of whether any Rental DME was actually provided to Retail Defendants, the wholesale invoices were fictitious, inflated or otherwise fraudulent, the invoices were sufficiently generic and devoid of detail to allow the Retail Defendants to seek reimbursement for expensive, complex Rental DME in amounts that far exceeded amounts they were entitled to receive under the No-fault Law.

114. On information and belief, Daytona Recovery is a shell company owned by an individual named Alla Mykulets ("Mykulets") (not named as a defendant in the Complaint).

115. On information and belief, Daytona Recovery has been used by Mykulets to funnel kickback payments into cash to the Retail Defendants.

116. As a matter/of pattern, practice, and protocol, the Retail Defendants routinely provided Covered Persons with expensive MWT, Cervical EMTT Devices, and Cold Compression/Cryotherapy Devices, that were medically unnecessary and provided as part of an elaborate kickback scheme for unnecessary referrals to maximize reimbursement.

117. In virtually every instance, the Covered Persons received the same battery of Rental DME, and oftentimes two or more Covered Persons that were purportedly injured in the same accident would also receive identical prescriptions for Rental DME despite being different ages, in different physical condition, differently positioned in the same motor vehicle accident, and possessing differing medical needs.

118. On information and belief, it is improbable that two or more Covered Persons in the same motor vehicle accident would suffer substantially similar injuries, be in similar physical health and/or have similar symptoms that would require identical or virtually identical Rental DME, let alone multiple Covered Persons.

119. In furtherance of the scheme to defraud alleged herein, pursuant to the fraudulent protocol of treatment, the HCPs at the No-fault Clinics routinely prescribed identical Rental DME to two or more Covered Persons who were involved in the same accident. By way of example and not limitation:

- On September 14, 2024, Covered Persons P.L., claim no. 0768986366-04, and M.M., claim no. 0768986366-05, were involved in the same automobile accident, but were in different physical health and experienced the impact from different locations in the vehicle, yet purportedly received the same Rental DME from Defendants Gate Supply and Tara Supply, respectively, pursuant to prescriptions issued by Junie White, NP (not named as a defendant in the Complaint) of South Bronx Medical Rehabilitation P.C. (not named as a defendant in the Complaint), a No-fault clinic located at 2558 Holland Avenue, Bronx, New York 10467, despite their injuries being almost certainly different:

| Covered Person | Date of Service | DME Billed For | Billing Code | Amount Billed | Provider |
|---|---|---|---|---|---|
| P.L. | 10/15/2024 | MW Therapy Device (Millimeter Wave Therapy Device (MWT)) | E1399 | $2,788.00 | Gate |
| | 10/10/2024 | Low Level Electromagnetic Therapy Device (Cervical EMTT) | E1399 | $2,299.00 | Tara |
| M.M. | 10/21/2024 | MW Therapy Device (Millimeter Wave Therapy Device (MWT)) | E1399 | $2,788.00 | Gate |
| | 10/21/2024 | Low Level Electromagnetic Therapy Device (Cervical EMTT) | E1399 | $2,299.00 | Tara |

- On September 15, 2024, Covered Persons S.H., claim no. 0769552505-06 and T.W., claim no. 0769552505-07, were involved in the same automobile accident, but were in different physical health and experienced the impact from different locations in the vehicle, yet purportedly received the same Rental DME from Defendants Gate Supply and Tara Supply, respectively, pursuant to prescriptions issued by Kyungsook Bu, NP (not named as a defendant in the Complaint) of AA Comprehensive Medical Care, P.C. (not named as a defendant in the Complaint), a No-fault clinic located at 3250 Westchester Avenue, Bronx, New York 10468, despite their injuries being almost certainly different:

| Covered Person | Date of Service | DME Billed For | Billing Code | Amount Billed | Provider |
|---|---|---|---|---|---|
| S.H. | 10/7/2024 | MW Therapy Device (Millimeter Wave Therapy Device (MWT)) | E1399 | $2,788.00 | Gate |
| | 10/7/2024 | Low Level Electromagnetic Therapy Device (Cervical EMTT) | E1399 | $2,299.00 | Tara |
| T.W. | 10/7/2024 | MW Therapy Device (Millimeter Wave Therapy Device (MWT)) | E1399 | $2,788.00 | Gate |
| | 10/7/2024 | Low Level Electromagnetic Therapy Device (Cervical EMTT) | E1399 | $2,299.00 | Tara |

- On September 13, 2024, Covered Persons R.A., claim no. 0768869356-01 and T.A., claim no. 0768869356-04, were involved in the same automobile accident, but were in different physical health and experienced the impact from different locations in the vehicle, yet purportedly received the same Rental DME from Defendants Gate Supply and Tara Supply, respectively, pursuant to prescriptions issued by Junie White, NP (not named as a defendant in the Complaint) of South Bronx Medical Rehabilitation P.C. (not named as a defendant in the Complaint), a No-fault clinic located at 2558 Holland Avenue, Bronx, New York 10467, despite their injuries being almost certainly different:

| Covered Person | Date of Service | DME Billed For | Billing Code | Amount Billed | Provider |
|---|---|---|---|---|---|
| R.A. | 10/22/2024 | MW Therapy Device (Millimeter Wave Therapy Device (MWT)) | E1399 | $2,788.00 | Gate |
| | 10/22/2024 | Low Level Electromagnetic Therapy Device (Cervical EMTT) | E1399 | $2,299.00 | Tara |
| T.A. | 10/22/2024 | MW Therapy Device (Millimeter Wave Therapy Device (MWT)) | E1399 | $2,788.00 | Gate |
| | 10/22/2024 | Low Level Electromagnetic Therapy Device (Cervical EMTT) | E1399 | $2,299.00 | Tara |

- On June 18, 2024, Covered Persons A.O., claim no. 0759152929-08, and S.C. claim no. 0759152929-04, were involved in the same automobile accident, but were in different physical health and experienced the impact from different locations in the vehicle, yet purportedly received the same DME from Defendant Leaf One Supply pursuant to prescriptions issued by Robert Drazic, DO (not named as a defendant in the Complaint) of Tri-Borough NY Medical Practice P.C. (not named as a defendant in the Complaint), a No-fault clinic located at 185 Kingsland Street, Nutley, New Jersey 07110, despite their injuries being almost certainly different:

| Covered Person | Date of Service | DME Billed For | Billing Code | Amount Billed |
|---|---|---|---|---|
| A.O. | 10/9/24 | Cold Compression/Cryotherapy Device | E1399 | $4,250.00 |
| | | Ultrasound/SAM Unit | E1399 | $3,900.00 |
| S.C. | 10/9/24 | Cold Compression/Cryotherapy Device | E1399 | $4,250.00 |
| | | Ultrasound/SAM Unit | E1399 | $3,900.00 |

120.   In furtherance of the predetermined fraudulent protocol of treatment, in numerous instances, the Rental DME prescribed were not documented in the initial examination report or a follow-up examination report of the HCP at the No-fault Clinics where the Covered Persons were treated. To the extent that any of the medical records did identify the Rental DME purportedly prescribed, the records did not explain the medical necessity for the Rental DME, did not identity or reference all of the DME listed on the prescriptions, and in some instances, identified Rental DME that was not included on the prescription issued by the HCPs. In addition, on many occasions, the prescriptions purportedly issued for Rental DME by the HCPs were often issued on dates that the Covered Persons did not treat with the HCPs. By way of example and not limitation:

- On November 2, 2023, Covered Persons M.M., claim no. 0775309248-01 and F.M., claim no. 0775309248-02, were involved in the same automobile accident, but were in different physical health and experienced the impact from different locations in the vehicle, yet purportedly received the same Rental DME from Defendants Gate Supply, and Tara Supply, respectively, pursuant to prescriptions issued by Kyungsook Bu, NP (not named as a defendant in the Complaint) of AA Comprehensive Medical Care, P.C. (not named as a defendant in the Complaint), a No-fault clinic located at 540 East Fordham Road, Bronx, New York 10458, despite their injuries being almost certainly different:

| Covered Person | Date of Service | DME Billed For | Billing Code | Amount Billed | Provider |
|---|---|---|---|---|---|
| M.M. | 11/21/2024 | MW Therapy Device (Millimeter Wave Therapy Device (MWT)) | E1399 | $2,788.00 | Gate |
| | 11/21/2024 | Low Level Electromagnetic Therapy Device (Cervical EMTT) | E1399 | $2,299.00 | Tara |

| Covered Person | Date of Service | DME Billed For | Billing Code | Amount Billed | Provider |
|---|---|---|---|---|---|
| F.M. | 11/18/2024 | MW Therapy Device (Millimeter Wave Therapy Device (MWT)) | E1399 | $2,788.00 | Gate |
| | 11/18/2024 | Low Level Electromagnetic Therapy Device (Cervical EMTT) | E1399 | $2,299.00 | Tara |

- On September 18, 2024, Covered Person J.P., claim no. 0767141427-06 purportedly presented for an initial examination at Integrated Medical Arts, P.C. (not named as a defendant in the Complaint), a No-fault Clinic located at 1671 West 10th Street, Brooklyn, New York 11223, yet the examination report made no mention of any prescription or recommendation for Rental DME. Notwithstanding, Defendants Gate Supply, and Tara Supply submitted bills pursuant to prescriptions issued by Marika Cherfas, MD (not named as a defendant in the Complaint), dated September 18, 2024, from the same No-fault Clinic, prescribing the following fraudulent equipment:

| Covered Person | Prescription Date | DME Prescribed | Billing Code | Amount Billed | Provider |
|---|---|---|---|---|---|
| J.P. | 9/18/2024 | MW Therapy Device (Millimeter Wave Therapy Device (MWT)) | E1399 | $2,788.00 | Gate |
| | | Low Level Electromagnetic Therapy Device (Cervical EMTT) | E1399 | $2,299.00 | Tara |

- On October 7, 2024, Covered Person D.G., claim no. 0772403325-01, purportedly presented for an initial examination at AA Comprehensive Medical Care P.C. (not named as a defendant in the Complaint), a No-fault Clinic located at 3250 Westchester Road, Bronx, New York 10461. Although the initial examination report made no mention of a prescription or recommendation for a Low Red Light Therapy Device, MW Therapy Device or Low Level Electromagnetic Therapy Device, Defendants Gate Supply, and Tara Supply submitted bills with prescriptions, dated October 7, 2024, purportedly issued by Kyungsook Bu, NP (not named as a defendant in the Complaint), from the same No-fault Clinic, prescribing the following fraudulent equipment:

| Covered Person | Prescription Date | DME Prescribed | Billing Code | Amount Billed | Provider |
|---|---|---|---|---|---|
| D.G. | 10/07/2024 | MW Therapy Device (Millimeter Wave Therapy Device (MWT)) | E1399 | $2,788.00 | Gate |
| | | Low Level Electromagnetic Therapy Device (Cervical EMTT) | E1399 | $2,299.00 | Tara |

- On September 19, 2024, Covered Person K.S., claim no. 0768300337-02, purportedly presented for an initial examination at Beach Medical Rehabilitation P.C. (not named as a defendant in the Complaint), a No-fault Clinic located at 2088 Flatbush Avenue, Brooklyn, New York 11229. Although the initial examination report made no mention of a prescription or recommendation for a Low Red Light Therapy Device, MW Therapy Device or Low Level Electromagnetic Therapy Device, Defendants Gate Supply, and Tara Supply submitted bills with prescriptions, dated September 19, 2024, purportedly issued by John McGee, DO (not named as a defendant in the Complaint), from the same No-fault Clinic, prescribing the following fraudulent equipment:

| Covered Person | Prescription Date | DME Prescribed | Billing Code | Amount Billed | Provider |
|---|---|---|---|---|---|
| K.S. | 9/19/2024 | MW Therapy Device (Millimeter Wave Therapy Device (MWT)) | E1399 | $2,788.00 | Gate |
| | | Low Level Electromagnetic Therapy Device (Cervical EMTT) | E1399 | $2,299.00 | Tara |

- On September 20, 2024, Covered Person E.A., claim no. 0765986823-04, purportedly presented for an initial examination at South Bronx Medical Rehabilitation P.C. (not named as a defendant in the Complaint), a No-fault Clinic located at 2558 Holland Avenue, Bronx, New York 10467. Although the initial examination report made no mention of a prescription or recommendation for a Low Red Light Therapy Device, MW Therapy Device or Low Level Electromagnetic Therapy Device, Defendants Gate Supply, and Tara Supply submitted bills with prescriptions, dated September 20, 2024, purportedly issued by Junie White, NP (not named as a defendant in the Complaint), from the same No-fault Clinic, prescribing the following fraudulent equipment:

| Covered Person | Prescription Date | DME Prescribed | Billing Code | Amount Billed | Provider |
|---|---|---|---|---|---|
| E.A. | 9/20/2024 | MW Therapy Device (Millimeter Wave Therapy Device (MWT)) | E1399 | $2,788.00 | Gate |
| | | Low Level Electromagnetic Therapy Device (Cervical EMTT) | E1399 | $2,299.00 | Tara |

- On August 1, 2024, Covered Person B.V., claim no. 0763577103-02, purportedly presented for an initial examination at South Bronx Medical Rehabilitation P.C. (not named as a defendant in the Complaint), a No-fault Clinic located at 2386 Jerome Avenue, Bronx, New York 10468. Although the initial examination report made no mention of a prescription or recommendation for a Low Red Light Therapy Device, MW Therapy Device

or Low Level Electromagnetic Therapy Device, Defendants Gate Supply, and Tara Supply submitted bills with prescriptions, dated September 19, 2024, purportedly issued by Elizabeth Lafargue, NP (not named as a defendant in the Complaint), from the same No-fault Clinic, prescribing the following fraudulent equipment:

| Covered Person | Prescription Date | DME Prescribed | Billing Code | Amount Billed | Provider |
|---|---|---|---|---|---|
| B.V. | 9/19/2024 | MW Therapy Device (Millimeter Wave Therapy Device (MWT)) | E1399 | $2,788.00 | Gate |
| | | Low Level Electromagnetic Therapy Device (Cervical EMTT) | E1399 | $2,299.00 | Tara |

- On October 18, 2024, Covered Person E.R.S., claim no. 0772307260-02, purportedly presented for an initial examination at Diyora Mirsaidova, PA, P.C. (not named as a defendant in the Complaint), a No-fault Clinic located at 100 Pennsylvania Avenue, Brooklyn, New York 11207. Although the initial examination report made no mention of a prescription or recommendation for a Low Red Light Therapy Device, MW Therapy Device or Low Level Electromagnetic Therapy Device, Defendants Gate Supply, and Tara Supply submitted bills with prescriptions, dated October 18, 2024, purportedly issued by Diyora Mirsaidova, PA (not named as a defendant in the Complaint), from the same No-fault Clinic, prescribing the following fraudulent equipment:

| Covered Person | Prescription Date | DME Prescribed | Billing Code | Amount Billed | Provider |
|---|---|---|---|---|---|
| E.R.S. | 10/18/2024 | MW Therapy Device (Millimeter Wave Therapy Device (MWT)) | E1399 | $2,788.00 | Gate |
| | | Low Level Electromagnetic Therapy Device (Cervical EMTT) | E1399 | $2,299.00 | Tara |

- On October 17, 2024, in the midst of a course of treatment at Far Rockaway Medical, P.C. (not named a defendant in the Complaint), a No-fault Clinic located at 1568 Ralph Avenue, Brooklyn, New York 11236, Covered Person S.P., claim no. 0758338008-04, purportedly presented at Accelerated Surgical Center (not named as a defendant in the Complaint) for an arthroscopic procedure, yet the surgical report made no mention of any prescription or recommendation for DME and/or orthotic devices. Notwithstanding, Leaf One Supply submitted a bill pursuant to a prescription issued by Robert Drazic, DO (not named as a Defendant in the Complaint) of Tri-Borough NY Medical Practice P.C. (not named a defendant in the Complaint), located at 185 Kingsland Street, Nutley, New Jersey 07110, prescribing the following fraudulent equipment:

| Covered Person | Prescription Date | DME Prescribed | Billing Code | Amount Billed |
|---|---|---|---|---|
| S.P. | 10/20/2024 | Cold Compression/Cryotherapy Device | E1399 | $4,250.00 |
| | | Ultrasound/SAM Unit | E1399 | $3,900.00 |

- On October 22, 2024, in the midst of a course of treatment at Oak Street Medical, P.C. (not named a defendant in the Complaint), a No-fault Clinic located at 1955 Southern Boulevard, Bronx, New York 10460, Covered Person S.S., claim no. 0758999873-01, purportedly presented at New York Surgery Center Queens (not named a defendant in the Complaint) for an arthroscopic procedure, yet the surgical report made no mention of any prescription or recommendation for DME and/or orthotic devices. Notwithstanding, Leaf One Supply submitted a bill pursuant to a prescription issued by Robert Drazic, DO (not named as a Defendant in the Complaint) of Tri-Borough NY Medical Practice P.C. (not named a defendant in the Complaint), located at 185 Kingsland Street, Nutley, New Jersey 07110, prescribing the following fraudulent equipment:

| Covered Person | Prescription Date | DME Prescribed | Billing Code | Amount Billed |
|---|---|---|---|---|
| S.S. | 10/27/2024 | Cold Compression/Cryotherapy Device | E1399 | $4,250.00 |
| | | Ultrasound/SAM Unit | E1399 | $3,900.00 |

- On November 15, 2024, in the midst of a course of treatment at Beach Medical Rehabilitation P.C. (not named a defendant in the Complaint), a No-fault Clinic located at 1 Cross Island Plaza, Rosedale, New York 11422, Covered Person I.D., claim no. 0761003318-01, purportedly presented at Global Surgery Center (not named as a defendant in the Complaint) for an arthroscopic procedure, yet the surgical report made no mention of any prescription or recommendation for DME and/or orthotic devices. Notwithstanding, Leaf One Supply submitted a bill pursuant to a prescription issued by Robert Drazic, DO (not named as a Defendant in the Complaint) of Tri-Borough NY Medical Practice P.C. (not named a defendant in the Complaint), located at 185 Kingsland Street, Nutley, New Jersey 07110, prescribing the following fraudulent equipment:

| Covered Person | Prescription Date | DME Prescribed | Billing Code | Amount Billed |
|---|---|---|---|---|
| I.D. | 10/20/2024 | Cold Compression/Cryotherapy Device | E1399 | $4,250.00 |
| | | Ultrasound/SAM Unit | E1399 | $3,900.00 |

121.    The foregoing are only representative examples of the claims that the Retail Owner Defendants mailed or caused to be mailed through the DME Defendants to Plaintiffs. In many of

the mailings that the Retail Owner Defendants caused to be made through the DME Defendants identified in the Appendix to the Complaint and claims identified in Exhibits "2" and "3," the DME Defendants billed for Rental DME purportedly supplied to Covered Persons notwithstanding that the HCP who wrote the prescription never mentioned the Rental DME in the contemporaneous examination, operative, and/or follow up reports.

122.    In furtherance of the scheme to defraud alleged herein, and to obtain access to Covered Persons for which the DME Defendants submitted fraudulent claims for Rental DME to Plaintiffs and insurers in general, the Retail Defendants entered into collusive arrangements with the prescribing No-fault Clinics and the John Doe and ABC Corporation Defendants in order to obtain prescriptions for the Rental DME purportedly supplied by the DME Defendants.

123.    The Retail Defendants engaged in these unlawful financial arrangements with the John Doe and/or ABC Corporation Defendants, including paying kickbacks in exchange for obtaining prescriptions for the Rental DME provided by the DME Defendants, among other durable medical equipment suppliers that billed on the claims. The unlawful financial arrangements allowed the Retail Defendants to submit hundreds of charges for the Rental DME that were billed in accordance with a predetermined course of treatment, irrespective of medical need, established at the No-fault Clinics, which almost exclusively treat No-fault Covered Persons, in amounts that far exceeded what the Retail Defendants were entitled to be reimbursed.

124.    The No-fault Clinics that supplied the DME Defendants with nearly identical, boilerplate prescriptions for Rental DME came from clinic locations with a "revolving door" of medical providers, including, but not limited to, the following clinic locations:  (i) 2558 Holland Avenue, Bronx, New York 10467; and (ii) 3250 Westchester Avenue, Bronx, New York 10468.

125.    Though ostensibly organized to provide a range of healthcare services to Insureds at a single location, the No-Fault Clinics from where the Retail Defendants obtained the prescription and referrals for the Rental DME, in actuality, were organized to supply "one-stop" shops for No-Fault insurance fraud.

126.    On information and belief, unlicensed laypersons, rather than the healthcare professionals working in the No-fault Clinics, created and controlled the purported patient base at the Clinics, and directed fraudulent protocols used to maximize profits without regard to actual patient care by exploiting the No-fault Law and applicable Fee Schedule through the utilization of various deceptive billing tactics engineered to maximize the amount of reimbursement from insurers, in general, and Plaintiffs, in particular.

127.    By way of example but not limitation, numerous other fraudulent prescriptions for DME, resulting in claims submitted by the Retail Owner Defendants, through their respective DME Defendants, to Plaintiffs, were also issued by medical providers that purportedly provided medical services through South Bronx Medical Rehabilitation P.C. (not named as a defendant in the Complaint), a professional corporation in which John McGee, DO ("McGee") (not named as a defendant in the Complaint) is listed as the record owner. McGee has been sued in the past by No-fault insurance carriers alleging that professional corporations purportedly owned by McGee were illegally owned and controlled by unlicensed laypersons in violation of New York law and/or that McGee engaged in illegal referral and kickback arrangements. *See State Farm Mut. Auto. Ins. Co. v. McGee, et al.*, 1:10-cv-03848 (PKC) (RML) (E.D.N.Y. 2010); *Allstate Ins. Co, et al. v. Ilyaich, et al.*, 1:13-cv-05464 (NG) (LB) (E.D.N.Y. 2013); *Allstate Ins. Co, et al. v. Rauch, et al.*, 2:22-cv-02424 (JMA) (LGD) (E.D.N.Y. 2020); *Government Employees Ins. Co., et al. v. McGee, et al.*, 1:23-cv-07753 (NCM)(PK) (E.D.N.Y. 2023).

128.    By way of further example but not limitation, a significant amount of the prescriptions for DME, resulting in claims submitted by the Retail Owner Defendants, through their respective DME Defendants, to Plaintiffs, were issued by medical providers that purportedly provided medical services through Tri-Borough (not named as a defendant in the Complaint), a professional corporation in which Shapiro (not named as a defendant in the Complaint) is listed as the record owner and which operates out of as many as 30 different locations throughout the New York metropolitan area. Shapiro, and several professional corporations in which he is listed as the record owner, including Tri-Borough, have been sued by multiple No-fault insurance carriers for allegedly engaging in various multimillion-dollar fraud schemes involving, among other things, rendering healthcare services pursuant to fraudulent billing and treatment protocols and engaging in illegal kickback and referral arrangements, in actions that remain pending or that ultimately settled. *See Government Employees Ins. Co., et al. v. Moshe, et al.,* 20-cv-1098 (FB) (RER) (E.D.N.Y. 2020); *State Farm Mut. Auto. Ins. Co., et al. v. Metro Pain Specialists P.C., et al.,* 21-cv-5523 (MKB) (PK) (E.D.N.Y. 2021); *Allstate Ins. Co., et al. v. Metro Pain Specialists Professional Corporation, et al.,* 21-cv-5586 (DG) (RER) (E.D.N.Y. 2021).

129.    By way of further example but not limitation, in furtherance of the scheme to defraud, a significant amount of the prescriptions for DME, resulting in claims submitted by the Retail Owner Defendants, though the DME Defendants, to Plaintiffs, were issued by medical providers that purportedly provided medical services through AA Comprehensive Medical Care, P.C. (not named as defendants in the Complaint), a professional corporation in which Abdalla I. Adam, MD ("Adam") (not named as defendants in the Complaint) is listed as the record owner and which operates out of multiple locations throughout the New York metropolitan area. Adam has been sued in the past by No-fault insurance carriers for engaging in various multimillion-dollar fraud

schemes involving, among other things, rendering healthcare services stemming from fraudulent billing and treatment protocols and engaging in illegal kickback and referral arrangements. *See LM Ins. Co., et al. v. Abdalla I. Adam, M.D., d/b/a Medelstar Medical Services, et al.*, 24-cv-04153 (EK) (MMH) (E.D.N.Y. 2024). Furthermore, one of the addresses at which AA Comprehensive Medical Care, P.C. operates, 3250 Westchester Avenue, Suite 205, Bronx, New York 10461, is the same address at which Tri-Borough operates.

130.    On information and belief, in connection with the unlawful financial arrangements with No-fault Clinics, the Retail Owner Defendants, through their respective DME Defendants, would pay kickbacks to individuals associated with the No-fault Clinics in order to obtain referrals for the fraudulent Rental DME be provided to Covered Persons who treated at the Clinics.

131.    On information and belief, in keeping with the fact that the prescriptions for Rental DME were the result of unlawful kickbacks and/or referral relationships between the Retail Defendants and the Clinics, the Retail Owner Defendants never met most of the HCPs who issued the prescriptions that were provided to the DME Defendants. Moreover, a number of the prescriptions submitted by the Retail Owner Defendants, through their respective DME Defendants, to Plaintiffs were fabricated and/or fraudulently altered and/or duplicated in order to misrepresent that Rental DME, including, but not limited to, electromagnetic devices and laser therapy devices, were medically necessary, when in fact, the Rental DME were provided, if at all, to financially enrich the Retail Owner Defendants through a fraudulent protocol of treatment.

132.    Further, the prescriptions from the No-fault Clinics were sent to and obtained by the DME Defendants directly from the No-fault Clinics without any communication or involvement by the Covered Persons. In further keeping with the fact that the prescriptions for the Rental DME were the result of unlawful financial arrangements between the Retail Defendants

and the No-fault Clinics, the Covered Persons were never given access to the prescriptions or given the option to use any other DME retailer for the Rental DME other than the DME Defendants.

133.    At all relevant times mentioned herein, each and every piece of Rental DME supplied by the DME Defendants was provided pursuant to a predetermined course of treatment, irrespective of medical necessity, based on illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics, who provided the prescriptions to the DME Defendants to be used in support of the fraudulent claims that exploited and manipulated the payment formulas under the applicable Fee Schedule in order to maximize the charges that they could submit to Plaintiffs and other insurers.

134.    As a result of the unlawful kickback and/or other financial compensation agreements, the Retail Defendants obtained large numbers of prescriptions and access to Covered Persons' identifying information that enabled them to bill hundreds of thousands of dollars to Plaintiffs, for just a few exorbitantly priced Rental DME.

135.    But for the payment of kickbacks from the Retail Defendants, the No-fault Clinics, in conjunction with the HCPs, would not have had any reason to: (i) direct a substantial number of medically unnecessary prescriptions to the DME Defendants; (ii) make the Covered Persons' information available to the DME Defendants; and/or (iii) provide the DME Defendants with the fraudulent prescriptions.

136.    Upon information and belief, the payment of kickbacks and/or other financial compensation by the Retail Defendants was made at or near the time the prescriptions were issued, but the Retail Defendants and the No-fault Clinics affirmatively concealed the particular amounts paid since the payment of kickbacks in exchange for patient referrals violates New York law.

137.    As a result of the unlawful financial arrangements, the Retail Defendants billed hundreds of thousands of dollars to Plaintiffs, and likely millions of dollars to other New York automobile insurers, for the Rental DME items.

138.    On information and belief, in furtherance of the scheme to defraud alleged herein, the DME Defendants purchased inexpensive Rental DME from Daytona Recovery, not named as a defendant herein, if any Rental DME was purchased at all, that were counterfeit or knockoffs of trademarked items made by other manufacturers. At all relevant times mentioned herein, the DME Defendants knew that they could purchase the counterfeit items at a fraction of the cost of the actual, trademarked items.

139.    In furtherance of the scheme to defraud alleged herein, the DME Defendants routinely submitted fraudulent documents, including, but not limited to, claim forms, prescriptions, and delivery receipts that materially misrepresented and/or concealed the nature and type of Rental DME purportedly provided to Covered Persons.

140.    In furtherance of the scheme to defraud alleged herein, the DME Defendants routinely submitted fraudulent bills seeking the maximum possible amount of reimbursement under the No-fault Law for expensive Rental DME that were never actually provided or not provided as billed and/or, if provided, provided pursuant to a predetermined course of treatment, without regard to medical necessity.

141.    In furtherance of the scheme to defraud alleged herein, the DME Defendants' bills intentionally omitted the make, model, and manufacturer of the Rental DME purportedly provided to Covered Persons in order to conceal the nature and type of Rental DME provided, to the extent they were provided at all.

142.    In furtherance of the scheme to defraud and to maximize reimbursement from Plaintiffs, virtually every bill submitted by the DME Defendants deliberately obscured all identifying information relating to the billed-for Rental DME so as to prevent Plaintiffs from determining the appropriate charges associated with any such Rental DME or whether the specific Rental DME was medically necessary.

143.    Defendants' activity promoted and facilitated other acts that imposed costs onto Plaintiffs well beyond the insurance proceeds that Defendants collected, including, but not limited to, Plaintiffs' expenditures for verifying each fraudulent claim through examinations under oath, associated attorneys' and court reporting fees, independent medical examinations ("IMEs"), and peer reviews.

## **FRAUDULENT BILLING OF RENTAL DME ITEMS**

144.    In furtherance of the scheme to defraud alleged herein, the DME Defendants, as a matter of pattern, practice, and protocol, routinely provided Covered Persons with expensive Rental DME items that were medically unnecessary and provided, on information and belief, as part of an elaborate kickback scheme for unnecessary referrals in order to maximize reimbursement.

145.    As part of the scheme, the Covered Persons purportedly receiving the expensive Rental DME items were involved in minor accidents, suffering soft-tissue injuries, to the extent they suffered any injuries at all, that did not require hospitalization and/or extensive medical treatment. Shortly after the accident, the Covered Persons are referred for a standard battery of medical treatment from fraudulent "medical mill" multidisciplinary clinics where they are referred for, among other services, physical therapy, chiropractic treatment, acupuncture, and

several pieces of DME and/or orthotic devices, including expensive Rental DME—in some instances, receiving up to ten (10) or more items.

146.    At the same time and/or shortly after Covered Persons purportedly receive several pieces of standard DME and/or orthotic devices, as part of Defendants' fraudulent protocol of treatment, the Covered Persons are prescribed a round of expensive pain management Rental DME by the HCPs operating out of the No-fault Clinics, including the Rental DME billed for and purportedly dispensed by the DME Defendants.

147.    Moreover, months after the accident, as part of the fraudulent protocol of treatment, many of the Covered Persons are eventually referred for arthroscopic surgery at ambulatory surgical centers ("ASCs") throughout New York and New Jersey. These surgical procedures are performed on an outpatient basis, not requiring an overnight hospital stay, and, in many cases, are not medically necessary.

148.    On the same day as the surgery, and within a few short days after the surgery, the Covered Persons are prescribed additional expensive perioperative and/or postoperative rental DME and/or compression devices, as part of a pattern and protocol of treatment to maximize reimbursement for items that were not medically necessary and/or were provided pursuant to a kickback arrangement or for other financial consideration. In many cases, between the pain management Rental DME prescribed out of the No-fault Clinics, supplied by the DME Defendants, and the perioperative and/or postoperative rental DME and/or compression devices prescribed after the referral to an ASC, the Covered Persons often receive at least four or more pieces of rental DME and/or compression devices, for up to 28 days or longer.

149.    In sum, Covered Persons purportedly receiving expensive pain management Rental DME from the DME Defendants, often receive more than ten (10) standard DME and/or

orthotic devices in addition to even more rental DME, all prescribed by HCPs operating out of the same location. By way of example but not limitation:

- In connection with claims submitted on behalf of Covered Person M.M., claim number 0768986366-05, upon information and belief, on September 26, 2024, pursuant to a prescription issued by Junie White, NP (not named as a Defendant in the Complaint) of South Bronx Medical Rehabilitation P.C. (not named as a defendant in the Complaint), a No-fault clinic located at 2558 Holland Avenue, Bronx, New York 10467, Harmony OS LLC (not named as a defendant in the Complaint), purportedly provided a transcutaneous electric joint stimulation device for $808.25. That same day, pursuant to a prescription issued by Junie White, NP, Nexgen Line Inc. (not named as a defendant in the Complaint), purportedly provided a pneumatic compression device for $2,826.70. Less than a week later, on September 30, 2024, pursuant to a prescription issued by Junie White, NP, Go For Med Supply Corp. (not named as a defendant in the Complaint) purportedly provided a cervical collar for $233.00, a cervical pillow for $22.04, a dry pressure mattress for $153.13, a lumbar cushion for $282.40, a bed board for $101.85, an LSO for $1,150.00, and a heat pad for $20.93. A few weeks after that, on October 21, 2024, pursuant to a prescription issued by Junie White, NP, Defendant Tara Supply purportedly provided low level electromagnetic therapy device for $2,299.00. The next day, October 22, 2024, pursuant to a prescription issued by Junie White, NP, Carbon Supply (not named as a defendant in the Complaint), purportedly provided a low red light therapy device for $2,428.00. That same day, pursuant to a prescription issued by Junie White, NP, Defendant Gate Supply purportedly provided a millimeter wave therapy device for $2,788.00. Less than two weeks later, October 23, 2024, pursuant to a prescription issued by Junie White, NP, Go For Med Supply Corp. purportedly provided a cervical traction unit for $502.63, and a custom shoulder orthosis $1,286.96. Ultimately, Plaintiffs were billed $14,902.89 in connection with at least *fourteen* pieces of DME.

- In connection with claims submitted on behalf of Covered Person J.C., claim number 0768434714-01, upon information and belief, on September 20, 2024, pursuant to a prescription issued by Kyungsook Bu, NP (not named as a defendant in the Complaint) of AA Comprehensive Medical Care, P.C. (not named as a defendant in the Complaint), a No-fault clinic located at 3250 Westchester Avenue, Bronx, New York 10468, Polly Supply Inc. (not named as a defendant in the Complaint), purportedly provided a cervical collar for $490.99, a cervical pillow for $22.04, an egg crate mattress for $171.43, a lumbar cushion for $364.05, a bed board for $101.85, an LSO for $747.55, a water circulating heat pad for $442.65, a heat pad for $20.93, a right shoulder orthosis for $387.65, and a left shoulder orthosis for $387.65. Seventeen days later, on October 7, 2024, pursuant to a prescription issued by Kyungsook Bu, NP, Polly Supply Inc. purportedly provided a cervical traction unit for

$502.63 and a custom LSO for $1,150.00. On that same day, pursuant to a prescription issued by Kyungsook Bu, NP, Carbon Supply (not named as a defendant in the Complaint), purportedly provided a low red light therapy device for $2,428.00, Defendant Gate Supply purportedly provided a millimeter wave therapy device for $2,788.00, and Defendant Tara Supply purportedly provided low level electromagnetic therapy device for $2,299.00. Three days after that, on October 10, 2024, pursuant to a prescription issued by Kyungsook Bu, NP, Polly Supply Inc. purportedly provided a TLSO for $1,224.50. Just over a week later, on October 18, 2024, pursuant to a prescription issued by Kyungsook Bu, NP, Polly Supply Inc. purportedly provided a TENS unit for $222.14, a TENS belt for $40.50, an infrared heat lamp for $385.47, and a whirlpool for $424.00. Less than a week after that, on October 24, 2024, pursuant to a prescription issued by Kyungsook Bu, NP, Polly Supply Inc. purportedly provided a left custom shoulder orthosis for $1,286.96, and a right custom shoulder orthosis for $1,286.96. One week later, on October 31, 2024, the Covered Person underwent a surgical procedure at an ASC, Global Surgical Center (not named as a defendant in the Complaint). On that same day, pursuant to a prescription issued by Robert Drazic, DO (not named as a defendant in the Complaint) of Tri-Borough NY Medical Care P.C. (not named as a defendant in the Complaint), a No-fault clinic located at 3250 Westchester Avenue, Bronx, New York, Healthy Elite Inc. (not named as a defendant in the Complaint) purportedly provided yet another left shoulder orthosis for $697.13, and another EMS unit for $808.25. Thereafter, on November 14, 2024, pursuant to a prescription issued by Dr. Drazic, Yasmed Inc. (not named as a defendant in the Complaint) purportedly provided an EMTT device for $6,600.00. That same day, pursuant to a prescription issued by Dr. Drazic, Defendant Leaf One Supply purportedly provided a cold compression cryotherapy device for $4,250.00, and an ultrasound SAM unit for $3,900.00. Ultimately, Plaintiffs were billed $33,430.33 in connection with at least *twenty-seven* pieces of DME.

- In connection with claims submitted on behalf of Covered Person J.G., claim number 0776952194-02, upon information and belief, on November 18, 2024, pursuant to a prescription issued by Kyungsook Bu, NP (not named as a defendant in the Complaint), Mazol Supply Inc. (not named as a defendant in the Complaint), purportedly provided a cervical collar for $490.99, a cervical pillow for $22.04, an egg crate mattress for $171.43, a lumbar cushion for $364.05, a bed board for $101.85, an LSO for $747.55, a water circulating heat pad for $442.65, a heat pad for $20.93, a left shoulder orthosis for $387.65, and an orthopedic car seat for $196.50. That same day, pursuant to a prescription issued by Kyungsook Bu, NP, Defendant Gate Supply, pursuant to a prescription issued by Kyungsook Bu, NP, purportedly provided a millimeter wave therapy device for $2,788.00, and Defendant Tara Supply purportedly provided low level electromagnetic therapy device for $2,299.00. The next day, on November 19, 2024, pursuant to a prescription issued by Kyungsook Bu, NP, Carbon Supply (not named as a defendant in the Complaint), purportedly provided a low red light therapy device for

$2,428.00. Just over two weeks later, on December 4, 2024, pursuant to a prescription issued by Kyungsook Bu, NP, Mazol Supply Inc. purportedly provided a cervical traction unit for $502.63, and a custom shoulder orthosis for $1,286.96. Just over two weeks after that, on December 19, 2024, pursuant to a prescription issued by Kyungsook Bu, NP, Mazol Supply Inc. purportedly provided a TENS unit for $222.14, a TENS belt for $40.50, an infrared heat lamp for $385.47, and a whirlpool for $424.00. Approximately two and a half weeks after that, on January 6, 2025, pursuant to a prescription issued by Kyungsook Bu, NP, Mazol Supply Inc. purportedly provided a second LSO for $1,150.00 and a TLSO for $1,224.50. Ultimately, Plaintiffs were billed $15,696.84 in connection with at least *twenty-one* pieces of DME.

- In connection with claims submitted on behalf of Covered Person A.V., claim number 0765039706-01, upon information and belief, on August 14, 2024, pursuant to a prescription issued by Hadley Graham, MD (not named as a Defendant in the Complaint) of Vista Medical P.C. (not named as a defendant in the Complaint), a No-fault clinic located at 146 Empire Boulevard, Brooklyn, New York 11225, Oberonmed Supply Corp. (not named as a Defendant in the Complaint), purportedly provided a bed board for $101.85, and a car seat for $405.00. Two weeks thereafter, on August 28, 2024, pursuant to a prescription issued by Dr. Graham, Health & Safety Inc. (not named as a Defendant in the Complaint) purportedly provided a cold therapy device for $2,250.00. The next day, on August 29, 2024, pursuant to a prescription issued by Dr. Graham, Oberonmed Supply Corp. purportedly provided a cervical traction unit for $502.63. Nearly four weeks later, on September 27, 2024, pursuant to a prescription issued by Dr. Graham, Go For Medical Supply Corp (not named as a Defendant in the Complaint) purportedly provided an osteogenesis stimulator device for $3,300.00 and waterproof tape for $1.10. Ten days after that, on October 7, 2024, pursuant to a prescription issued by Dr. Graham, Go For Medical Supply Corp purportedly provided a left knee orthosis for $1,107.70, a right knee orthosis for $1,107.70, a left shoulder orthosis for $1,286.96, and a right shoulder orthosis for $1,286.96. On October 17, 2024, the Covered Person underwent a surgical procedure at an ASC, Accelerated Surgical Center (not named as a defendant in the Complaint). On that same date, pursuant to a prescription issued by Robert Drazic, DO (not named as a defendant in the Complaint) of Tri-Borough NY Medical Practice P.C. (not named as a defendant in the Complaint), a No-fault clinic located at 185 Kingsland Street, Nutley, New Jersey 07110, Healthy Elite Inc. (not named as a defendant in the Complaint) purportedly provided a second left shoulder orthosis for $697.13, and an EMS unit for $808.25. Thirteen days later, on October 30, 2023, pursuant to a prescription issued by Dr. Drazic, Defendant Leaf One Supply purportedly a cold compression/cryotherapy device for $4,250.00, and an ultrasound SAM unit for $3,900.00. That same day, pursuant to a prescription issued by Dr. Drazic, Yasmed Inc. (not named a defendant in the Complaint) provided an EMTT Device for $6,600.00. Ultimately, Plaintiffs were billed $27,605.28 in connection with at least *fifteen* pieces of DME and/or orthotic devices.

150.    Such devices are medically unnecessary, and far less expensive and intrusive courses of treatment, such as the provision of inexpensive cold packs, would provide the same if not better treatment than the complex devices provided by the Retail Defendants. In that regard, the supply of such items was motivated by money, without regard to the actual need of the Covered Persons, for the express purpose of increasing the amount of reimbursement sought from insurers in general, and Plaintiffs in particular.

**1.    Fraudulent Billing for Cold Compression/Cryotherapy Devices**

151.    In furtherance of the scheme to defraud alleged herein, Haidarzhy, through Leaf One Supply, routinely submitted or caused to be submitted bills to Plaintiffs for Cold Compression/Cryotherapy Devices that were not provided as billed, supplied pursuant to fraudulent protocol of treatment, medically unnecessary and/or never provided.

152.    Each of the Covered Persons that received Cold Compression/Cryotherapy Devices were involved in minor impact accidents and suffered only soft tissue injuries, to the extent they suffered any injuries at all.

153.    Shortly after the accident, each of the Covered Persons visited multidisciplinary No-fault Clinics that, in exchange for kickbacks and/or other financial compensation, referred the Covered Persons for a standard battery of treatment that included, but is not limited to, referrals for physical therapy, chiropractic treatment, acupuncture, electrodiagnostic testing and basic DME. Indeed, within 30 days of the accident, the Covered Persons are dispensed a substantial and similar battery of regular DME, as well as expensive pain management Rental DME, such as Cold Compression/Cryotherapy Devices, from Defendant Leaf One Supply pursuant to a fraudulent protocol established by the No-fault Clinics that issue the fraudulent prescription.

154.    After the initial round of unnecessary treatment, upon a follow up visit with the No-fault Clinics, in most cases, many of the Covered Persons are referred for surgical procedures performed at ambulatory surgical centers ("ASCs") throughout New York and New Jersey.

155.    After the surgery at the ASC, the Covered Persons are also purportedly provided with expensive rental post-surgical, rehabilitative DME and/or compression devices, along with several pieces of Rental DME.

156.    Cold Compression/Cryotherapy Devices are used to improve venous circulation in the limbs of a patient suffering from edema. The primary purpose of the device is to ensure movement of venous blood by pressurizing the tissues in the limb, thereby forcing fluids, such as blood and lymph out of the pressurized area. The pressure is later reduced, allowing for increased blood flow back into the limb. *See* B. Kullenberg, S. Ylipää, K. Söderlund, S. Resch, "Postoperative Cryotherapy After Total Knee Arthroplasty: A Prospective Study of 86 Patients." The Journal of Arthroplasty. (Dec. 2006) 21 (8): 1175-1179.

157.    The use of Cold Compression/Cryotherapy Devices purportedly dispensed by the DME Defendants is rarely indicated in the types of procedures performed on the Covered Person to prevent limb edema. In almost all cases, the prevention and/or alleviation of post-surgical edema can be done simply by using simple cold packs, compressive bandages, and elevation of the limb. In fact, Aetna has also issued a policy bulletin that establishes Cryotherapy Devices are experimental, investigational, or unproven because the effectiveness of these approaches has not been established. *See* https://www.aetna.com/cpb/medical/data/200_299/0297.html.

158.    In keeping with the fact that the prescriptions for the Rental DME were not medically necessary and were provided pursuant to predetermined fraudulent protocols, the DME purportedly prescribed did not provide any medical benefit to Covered Persons.

159.    In a legitimate medical clinic setting, when a Covered Person is prescribed DME by an HCP, the provider would indicate in a contemporaneous examination report the DME that was prescribed and the reasons for prescribing it. In keeping with the fact that the prescriptions for the Rental DME were part of a predetermined protocol designed to maximize profits and not based upon medical necessity, the pre-printed prescription forms contained the same exact boilerplate language proclaiming, among other things, that, "the cold therapy unit will productively reduce recovery time as well as reduce swelling edema and pain...delivering comprehensive flexible and proven treatment of swelling, edema, pain or/and other post-surgical or injury conditions." There is, however, no discussion of any of the Covered Persons' actual individual needs and diagnoses.

160.    Notwithstanding the typical uses for the devices, referring HCPs routinely issue prescriptions for Cold Compression/Cryotherapy Devices for Covered Persons that were involved in minor impact accidents and suffered only minor, soft tissue injuries, to the extent they suffered any injuries at all, and in virtually every instance, underwent outpatient arthroscopic surgical procedures, along with receiving a host of other expensive DME devices, designed to upcharge insurers for tens of thousands of dollars as part of a fraudulent protocol of medically unnecessary treatments. In that regard, whether prior to, contemporaneously with, or sometime after the dispensing of the Cold Compression/Cryotherapy Devices, the Covered Persons receive a substantial and similar battery of regular and rental DME pursuant to a fraudulent protocol established by the No-fault Clinics that issue the fraudulent prescription. The Cold Compression/ Cryotherapy Devices are often prescribed with one or more other rental DME devices such as EMTT Devices, Cervical EMTT Devices, and Ultrasound/SAM Units.

161.    In view of the foregoing, the Cold Compression/Cryotherapy Devices supplied by Leaf One Supply were dispensed pursuant to protocol of treatment, without regard to medical

necessity as part of an elaborate scheme to supply Covered Persons with excessive and unnecessary Rental DME, in excessive amounts beyond what it was entitled to be reimbursed under the No-fault Law, in order to maximize reimbursement and exploit the payment formulas under the applicable Fee Schedule.

162.    In that regard, Leaf One Supply routinely billed Plaintiffs for Cold Compression/Cryotherapy Devices under Code E1399, an HCPCS Code recognized under the Fee Schedule without a listed maximum reimbursement amount.

163.    On information and belief, notwithstanding that Leaf One Supply provided the devices on a rental basis for dates of service of at least a month or longer, their claims for reimbursement routinely misrepresented that it provided the devices to Covered Persons as a sale, indicating that it provided such items for a single day of service.

164.    On information and belief, the prescriptions for the for Cold Compression/ Cryotherapy Devices are never given to the Covered Persons. Instead, the prescriptions are sent from many of the same referring medical clinics directly to a predetermined Cold Compression/ Cryotherapy Device provider in exchange for a kickback and/or other financial incentive or compensation.

165.    In numerous cases, the prescriptions from the referring providers are fabrications as part of the scheme to maximize reimbursement through these medically unnecessary rental items and for Cold Compression/Cryotherapy Devices in particular.

166.    Upon receipt of the prescriptions for the Cold Compression/Cryotherapy Devices, Haidarzhy, through Leaf One Supply, routinely submit to insurers bills in an amount of up to $4,250.00, regardless of actual patient need in order to maximize reimbursement.

167.    Oftentimes, the devices are delivered to the Covered Persons without their knowledge or expectation. Upon delivery, proper instruction on the proper use of the device and the risks associated with the device are not explained to the Covered Persons. In many cases and as a result, the Covered Persons do not use the device and/or use the device improperly, posing a risk to the Covered Person's health as well as rendering the device ineffective.

168.    Leaf One Supply's acquisition cost for the Cold Compression/Cryotherapy Devices was approximately $2,802.39 for devices for the knee and $2,847.51 for devices for the shoulder.

169.    The maximum permissible monthly rental rate for Cold Compression/Cryotherapy Devices billed for by Leaf One Supply, under billing code E1399 is ten percent of its acquisition cost, or $280.24 for devices for the knee and $284.75 for devices for the shoulder.

170.    Notwithstanding, Leaf One Supply grossly over-billed Plaintiffs for at least a one-month rental of Cold Compression/Cryotherapy Devices, far in excess of the maximum permissible amount for the Compression/Cryotherapy Devices Leaf One Supply purportedly provided under code E1399.

171.    By way of example and not limitation, Haidarzhy, through Leaf One Supply, routinely submitted bills to Plaintiffs for Cold Compression/Cryotherapy Devices under code E1399 in amounts up to and including $4,250.00 as if the items were provided to Covered Person for sale, when, on information and belief, the items were actually provided as a rental at a monthly rental rate far in excess of what is permissible under the No-fault Law. Exhibit "5" in the accompanying Compendium of Exhibits is a representative sample of claims where Haidarzhy, through Leaf One Supply, submitted fraudulent bills to Plaintiffs for Cold Compression/Cryotherapy Devices under code E1399.

172.    Furthermore, by way of example and not limitation, the Appendix to the Complaint identifies a representative sample of predicate acts, including claim nos. 0769323437-01, 0766862528-01, 0761003318-01, 0758338008-04, and 0755765047-01, in which Haidarzhy, through Leaf One Supply, mailed or caused to be mailed to Plaintiffs fraudulent claims for Cold Compression/Cryotherapy Devices, billed under code E1399, that were supplied pursuant to the fraudulent protocol of treatment described herein, in exchange for kickbacks and/or other financial compensation agreements, for medically unnecessary items in order to exploit and manipulate the payment formulas under the applicable Fee Schedule to maximize the charges that they could submit to Plaintiffs.

173.    The bills mailed or caused to be mailed by Haidarzhy, through Leaf One Supply, were fraudulent in that they misrepresented that the Cold Compression/Cryotherapy Devices (i) were medically necessary when in fact they were not; (ii) they were provided pursuant to legitimate prescriptions when in fact they were not; (iii) they prescribed for a legitimate medical purpose when in fact it was prescribed solely to enrich Defendants; and (iv) the fee charged for the Cold Compression/Cryotherapy Devices was not in excess of the applicable Fee Schedule in existence at the time the claim was mailed and/or the maximum reimbursement amount allowed under the No-fault Law. In these and numerous other ways alleged herein, Haidarzhy, through Leaf One Supply, designed and executed a fraudulent blueprint to bill and obtain payments from Plaintiffs for expensive Cold Compression/Cryotherapy Devices that they were not entitled to receive under the No-fault law and implementing regulations.

## 2.    Fraudulent Billing for Ultrasound/SAM Units

174.    In furtherance of the scheme to defraud alleged herein, Haidarzhy, through Leaf One Supply, routinely submitted or caused to be submitted bills to Plaintiffs for Ultrasound/SAM

Units that were not provided as billed, supplied pursuant to fraudulent protocol of treatment, medically unnecessary and/or never provided.

175.    Each of the Covered Persons that received Ultrasound/SAM Units were involved in minor impact accidents and suffered only soft tissue injuries, to the extent they suffered any injuries at all.

176.    Shortly after the accident, each of the Covered Persons visited multidisciplinary No-fault Clinics that, in exchange for kickbacks and/or other financial compensation, referred the Covered Persons for a standard battery of treatment that included, but is not limited to, referrals for physical therapy, chiropractic treatment, acupuncture, electrodiagnostic testing and basic DME. Indeed, within 30 days of the accident, the Covered Persons are dispensed a substantial and similar battery of regular DME, as well as expensive pain management Rental DME, such as Ultrasound/SAM Units, from Defendant Leaf One Supply, pursuant to a fraudulent protocol established by the No-fault Clinics that issue the fraudulent prescription.

177.    After the initial round of unnecessary treatment, upon a follow up visit with the No-fault Clinics, in most cases, many of the Covered Persons are referred for surgical procedures performed at ambulatory surgical centers ("ASCs") throughout New York and New Jersey.

178.    After the surgery at the ASC, the Covered Persons are also purportedly provided with expensive rental post-surgical, rehabilitative DME and/or compression devices, along with several pieces of Rental DME. By way of example and not limitation:

179.    The Ultrasound/SAM Unit is a battery powered, wearable and portable device that purports to produce ultrasound at a frequency of three (3) megahertz in order to provide heat-related medical therapy through the delivery of low-intensity acoustic waves for the treatment of

acute and chronic tendinopathies, muscle strain or spasms, or pain associated with osteoarthritis for a two-to-six-week period. **Error! Hyperlink reference not valid.**

180.     On information and belief, notwithstanding its intended use, the ultrasound purportedly provided by the Ultrasound/SAM Unit is insufficient to produce clinical effective heating.

181.     Moreover, the heating pattern of the Ultrasound/SAM Unit is circumscribed and not useful for large areas of tissues such as prescribed by the referring HCP. For example, the ultrasound purportedly provided by the Ultrasound/SAM Unit only heats the tissue directly below the transducer, making it impractical for heating large areas such as trapezius muscles and cervical or lumbosacral paraspinal muscles. In fact, Aetna has issued a policy bulletin that established that sustained acoustic medicine (SAM Units) is experimental, investigational, or unproven. *See* https://www.aetna.com/cpb/medical/data/600_699/0673.html#:~:text=Medial%20knee%20implanted%20shock%20absorber,which%20includes%20stem%20cell%20therapy. And neither does there exist a Medicaid DME Procedure Code for SAM Units.

182.     In keeping with the fact that the prescriptions for the Rental DME were not medically necessary and were provided pursuant to predetermined fraudulent protocols, the DME purportedly prescribed did not provide any medical benefit to Covered Persons.

183.     In a legitimate medical clinic setting, when a Covered Person is prescribed DME by an HCP, the provider would indicate in a contemporaneous examination report the DME that was prescribed and the reasons for prescribing it. In keeping with the fact that the prescriptions for the Rental DME were part of a predetermined protocol designed to maximize profits and not based upon medical necessity, the pre-printed prescriptions forms contained the same exact boilerplate

language proclaiming, among other things, that the SAM Unit will "reduce pain and accelerate the natural healing cascade for musculoskeletal related injuries, sam® has been clinically shown to increase Collagen Laydown, increase Oxygenated Hemoglobin in the muscle and increase Blood-flow to accelerate the recovery and reduction of pain for the associated injury." There is, however, no discussion of any of the patients' actual individual needs and diagnoses.

184.    Notwithstanding the typical uses for the devices, referring HCPs routinely issue prescriptions for Ultrasound/SAM Units for Covered Persons that were involved in minor impact accidents and suffered only minor, soft tissue injuries, to the extent they suffered any injuries at all, and in virtually every instance, underwent outpatient arthroscopic surgical procedures, along with receiving a host of other expensive DME devices, designed to upcharge insurers for tens of thousands of dollars as part of a fraudulent protocol of medically unnecessary treatments. In that regard, whether prior to, contemporaneously with, or sometime after the dispensing of the Ultrasound/SAM Units, the Covered Persons receive a substantial and similar battery of regular and rental DME pursuant to a fraudulent protocol established by the No-fault Clinics that issue the fraudulent prescription. The Ultrasound/SAM Units are often prescribed with one or more other rental DME devices such as EMTT Devices, Cervical EMTT Devices, and Cold Compression/Cryotherapy Devices.

185.    In view of the foregoing, the Ultrasound/SAM Units supplied by Leaf One Supply were dispensed pursuant to protocol of treatment, without regard to medical necessity as part of an elaborate scheme to supply Covered Persons with excessive and unnecessary Rental DME, in excessive amounts beyond what it was entitled to be reimbursed under the No-fault Law, in order to maximize reimbursement and exploit the payment formulas under the applicable Fee Schedule.

186.    In that regard, Leaf One Supply routinely billed Plaintiffs for Ultrasound/SAM Units under Code E1399, an HCPCS Code recognized under the Fee Schedule without a listed maximum reimbursement amount.

187.    On information and belief, notwithstanding that Leaf One Supply provided the devices on a rental basis for dates of service of twenty-eight days or longer, their claims for reimbursement routinely misrepresented that it provided the devices to Covered Persons as a sale, indicating that it provided such items for a single day of service.

188.    On information and belief, the prescriptions for the Ultrasound/SAM Units are never given to the Covered Persons. Instead, the prescriptions are sent from many of the same referring medical clinics directly to a predetermined Ultrasound/SAM Unit provider in exchange for a kickback and/or other financial incentive or compensation.

189.    In numerous cases, the prescriptions from the referring providers are fabrications as part of the scheme to maximize reimbursement through these medically unnecessary rental items and the Ultrasound/SAM Units in particular.

190.    On information and belief, upon receipt of the prescriptions purportedly filled by provision of Ultrasound/SAM Units, Haidarzhy, through Leaf One Supply, routinely submits bills to insurers indicating that the items is provided to the Covered Person for a single day, when, in actuality, the items is provided for rental periods of up to one month regardless of actual Covered Person need in order to maximize reimbursement.

191.    Oftentimes, the devices are delivered to the Covered Persons without their knowledge or expectation. Upon delivery, proper instruction on the proper use of the device and the risks associated with the device are not explained to the Covered Persons. In many cases and

as a result, the Covered Persons do not use the device and/or use the device improperly, posing a risk to the Covered Person's health as well as rendering the device ineffective.

192.    At all relevant times mentioned herein, Leaf One Supply routinely billed Plaintiffs under code E1399 in the amount of $3,900.00 for a purported sale of a Ultrasound/SAM Unit.

193.    On information and belief, at all relevant times mentioned herein, to the extent anything was provided to Covered Persons at all, Leaf One Supply provided Covered Persons Ultrasound/SAM Units on a rental basis for the period of one month.

194.    In connection with such claims, Haidarzhy, through Leaf One Supply, submitted or caused to be submitted wholesale invoices reflecting an acquisition cost of $2,879.99 per Ultrasound/SAM Units.

195.    The maximum permissible monthly rental rate for Ultrasound/SAM Units billed for by Leaf One Supply under billing code E1399 is ten percent of its acquisition cost, or $287.99.

196.    Notwithstanding, Leaf One Supply grossly over-billed Plaintiffs for a one-month rental of Ultrasound/SAM Units, far in excess of the maximum permissible for the Ultrasound/SAM Units Leaf One Supply purportedly provided under code E1399.

197.    By way of example and not limitation, Haidarzhy, through Leaf One Supply, routinely submitted to Plaintiffs bills for Ultrasound/SAM Units under code E1399 as if the items were provided to Covered Person for sale, when, on information and belief, the items were actually provided as a rental at a monthly rental rate far in excess of what is permissible under the No-fault Law. Exhibit "6" in the accompanying Compendium of Exhibits is a representative sample of claims where Haidarzhy, through Leaf One Supply, submitted fraudulent bills to Plaintiffs for Ultrasound/SAM Units under code E1399.

198.    Furthermore, by way of example and not limitation, the Appendix to the Complaint identifies a representative sample of predicate acts, including claim nos. 0769323437-01, 0761003318-01, 0758338008-04, and 0755765047-01, in which Haidarzhy, through Leaf One Supply, mailed or caused to be mailed to Plaintiffs fraudulent claims for Ultrasound/SAM Units, billed under code E1399, that were supplied pursuant to the fraudulent protocol of treatment described herein, in exchange for kickbacks and/or other financial compensation agreements, for medically unnecessary items in order to exploit and manipulate the payment formulas under the applicable Fee Schedule to maximize the charges that they could submit to Plaintiffs.

199.    The bills mailed or caused to be mailed by Haidarzhy, through Leaf One Supply, were fraudulent in that they misrepresented that the Ultrasound/SAM Units (i) were medically necessary when in fact they were not; (ii) they were provided pursuant to legitimate prescriptions when in fact they were not; (iii) they were prescribed for a legitimate medical purpose when in fact it was prescribed solely to enrich Defendants; and (iv) the fee charged for the Ultrasound/SAM Units was not in excess of the applicable Fee Schedule in existence at the time the claim was mailed and/or the maximum reimbursement amount allowed under the No-fault Law. In these and numerous other ways alleged herein, Haidarzhy. through Leaf One Supply, designed and executed a fraudulent blueprint to bill and obtain payments from Plaintiffs for expensive Ultrasound/SAM Units that they were not entitled to receive under the No-fault law and implementing regulations.

**3.    Fraudulent Billing for Millimeter Wave Therapy Devices**

200.    In furtherance of the scheme to defraud alleged herein, Yakubiak, through Gate Supply, routinely submitted or caused to be submitted bills to Plaintiffs for Millimeter Wave

Therapy ("MWT") Devices that were not provided as billed, supplied pursuant to fraudulent protocol of treatment, medically unnecessary and/or never provided.

201.    Each of the Covered Persons that received MWT Devices were involved in minor impact accidents and suffered only soft-tissue injuries, to the extent they suffered any injuries at all.

202.    Shortly after the accident, each of the Covered Persons visited multidisciplinary No-fault Clinics that, in exchange for kickbacks and/or other financial compensation, referred the Covered Persons for a standard battery of treatment that included, but is not limited to, referrals for physical therapy, chiropractic treatment, acupuncture, electrodiagnostic testing and basic DME. Indeed, within 30 days of the accident, the Covered Persons are dispensed a substantial and similar battery of regular DME, as well as expensive pain management Rental DME, such as MWT Devices from Defendant Gate Supply, pursuant to a fraudulent protocol established by the No-fault Clinics that issue the fraudulent prescription.

203.    MWT treatment comprises the application of low-intensity millimeter wavelength electromagnetic waves, which are purported to promote pain relief and the healing of soft tissue injures and fractures through enhancement of blood circulation and reduction of inflammation. However, MWT lacks extensive, high-quality clinical trials to fully validate its efficacy and as such should be considered an experimental and unproven therapy modality. Accordingly, MWT is recognized as only a potential supplementary treatment for pain management and is not recommended unless a patient's condition fails to improve through conservative treatment. *See* International Journal of Molecular Science, 2024, Aug. 8;25(16):8638. doi: 10.3390/ijms25168638.

204.   In keeping with the fact that the prescriptions for the Rental DME were not medically necessary and were provided pursuant to predetermined fraudulent protocols, the Rental DME purportedly prescribed did not provide any medical benefit to Covered Persons.

205.   In keeping with the fact that the prescriptions for the Rental DME were part of a predetermined protocol designed to maximize profits and not based upon medical necessity, the pre-printed prescriptions forms contained the same exact boilerplate language proclaiming, among other things, that, "MWT is combining analgesic properties with improvement of tissue function and regeneration ability. The treatment provides rapid onset of lasting pain relief which would significantly increase the quality of pain management, improve patient's adaptation to functional limitations and promote compliance with other modalities inducted in therapy." There is, however, no discussion of any of the Covered Persons' actual individual needs and diagnoses.

206.   Notwithstanding the typical uses for the devices, referring HCPs routinely issue prescriptions for MWT Devices for Covered Persons that were involved in minor impact accidents and suffered only minor, soft tissue injuries, to the extent the suffered any injuries at all, and in some instances, underwent or are about to undergo outpatient arthroscopic surgical procedures, along with a host of other expensive DME devices, designed to upcharge insurers for tens of thousands of dollars as part of a fraudulent protocol of medically unnecessary treatments. In that regard, whether prior to, contemporaneously with, or sometime after the dispensing of the MWT Device, the Covered Persons receive a substantial and similar battery of regular and rental DME pursuant to a fraudulent protocol established by the No-fault Clinics that issue the fraudulent prescription. The MWT Devices are often prescribed with one or more other rental DME devices such as Cervical EMTT Devices.

207.    In a legitimate medical clinic setting, the HCP prescribing pain management DME provider should evaluate and document multiple factors for the necessity of the Rental DME, including, but not limited to: (i) whether the Covered Person is capable of using the at-home treatment devices; (ii) whether the DME is likely to help improve the Covered Person's surgical recovery; and (iii) whether the Covered Person is likely to use the DME. In nearly all circumstances, the medical reports neglect to document any such findings nor describe how the Rental DME directly related to each Covered Persons' individual presentation for post-surgical recovery.

208.    Moreover, it is extremely improbable that virtually all of the Covered Persons who received DME from Gate Supply and other DME providers, who may have also undergone minimally invasive surgical procedures, would ultimately receive the same and/or nearly identical DME, despite being differently situated. However, pursuant to the predetermined fraudulent protocols implemented by Gate Supply and others, the Covered Persons were prescribed virtually identical pre- and/or post-surgical fraudulent Rental DME.

209.    In a legitimate medical clinic setting, when a Covered Person is prescribed DME by an HCP, the provider would indicate in a contemporaneous examination report the DME that was prescribed and the reasons for prescribing it. In keeping with the fact that the prescriptions for Rental DME provided to Covered Persons by Gate Supply were not medically necessary and provided pursuant to a predetermined fraudulent protocol, the contemporaneous examination reports written by the HCPs virtually never referenced the MWT Devices supplied by Gate Supply and never explained the necessity for the device.

210.    In keeping with the fact that the MWT Devices were not medically necessary and were provided pursuant to a predetermined fraudulent protocol, the prescriptions issued by the

No-fault Clinics that purportedly examined the Covered Persons were issued on boilerplate, pre-printed prescriptions forms that contained the same exact boilerplate language ostensibly explaining the medical necessity for the device, along with the physicians generic statement concerning the efficacy of the device. There is, however, no discussion of any of the Covered Persons' individual needs and diagnoses, nor any explanation how the device will assist the specific Covered Person. What is more, on information and belief, in nearly all instances the device is prescribed for an identical period of 28 days regardless of the Covered Persons' conditions. By way of example and not limitation, Exhibit "7" in the accompanying Compendium of Exhibits is a representative sample of prescriptions with the identical, boilerplate language.

211.    In view of the foregoing, the MWT Devices supplied by Gate Supply were dispensed pursuant to protocol of treatment, without regard to medical necessity as part of an elaborate scheme to supply insureds with excessive and unnecessary Rental DME, in excessive amounts beyond what it was entitled to be reimbursed under the No-fault Law, in order to maximize reimbursement and exploit the payment formulas under the applicable Fee Schedule.

212.    On information and belief, the prescriptions for the MWT Devices are never given to the Covered Persons. Instead, the prescriptions are sent from many of the same referring medical clinics directly to a predetermined MWT Device provider in exchange for a kickback and/or other financial incentive or compensation.

213.    In numerous cases, the prescriptions from the referring providers are fabrications as part of the scheme to maximize reimbursement through these medically unnecessary rental items and the MWT Devices in particular.

214.    On information and belief, upon receipt of the prescriptions purportedly filled by provision of MWT Devices, Yakubiak, through Gate Supply, routinely submits bills to insurers

indicating that the items is provided to the Covered Person for a single day, when, in actuality, the items is provided for rental periods of up to one month regardless of actual Covered Person need in order to maximize reimbursement.

215.    Oftentimes, the devices are delivered to the Covered Persons without their knowledge or expectation. Upon delivery, proper instruction on the proper use of the device and the risks associated with the device are not explained to the Covered Persons. In many cases and as a result, the Covered Persons do not use the device and/or use the device improperly, posing a risk to the Covered Person's health as well as rendering the device ineffective.

216.    At all relevant times mentioned herein, Gate Supply routinely billed Plaintiffs under code E1399 in the amount of $2,788.00 for a purported sale of a MWT Device.

217.    On information and belief, at all relevant times mentioned herein, to the extent anything was provided to Covered Persons at all, Gate Supply provided Covered Persons Compression Devices on a rental basis for the period of one month.

218.    In connection with such claims, Yakubuak, through Gate Supply, submitted or caused to be submitted wholesale invoices reflecting an acquisition cost of $2,055.00 per MWT Device.

219.    The maximum permissible monthly rental rate for MWT Devices billed for by Gate Supply under billing code E1399 is ten percent of its acquisition cost, or $205.50.

220.    Notwithstanding, Gate Supply grossly over-billed Plaintiffs for a one-month rental of MWT Devices, far in excess of the maximum permissible for the MWT Devices Gate Supply purportedly provided under code E1399.

221.    By way of example and not limitation, Yakubiak, through Gate Supply, routinely submitted to Plaintiffs bills for MWT Devices under code E1399 in amounts up to and including

$2,788.00 as if the items were provided to Covered Person for sale, when, on information and belief, the items were actually provided as a rental at a monthly rental rate far in excess or what is permissible under the No-fault Law. Exhibit "8" in the accompanying Compendium of Exhibits is a representative sample of claims where Yakubiak, through Gate Supply, submitted fraudulent bills to Plaintiffs for  MWT Devices under code E1399.

222.    Furthermore, by way of example and not limitation, the Appendix to the Complaint identifies a representative sample of predicate acts, including claim nos. 0768102691-01 and 0775309248-01, in which Yakubiak, through Gate Supply, mailed or caused to be mailed to Plaintiffs fraudulent claims for MWT Devices, billed under code E1399, that were supplied pursuant to the fraudulent protocol of treatment described herein, in exchange for kickbacks and/or other financial compensation agreements, for medically unnecessary items in order to exploit and manipulate the payment formulas under the applicable Fee Schedule to maximize the charges that they could submit to Plaintiffs.

223.    The bills mailed or caused to be mailed by Yakubiak, through Gate Supply, were fraudulent in that they misrepresented that the MWT devices (i) were medically necessary when in fact they were not; (ii) they were provided pursuant to legitimate prescriptions when in fact they were not; (iii) they were prescribed for a legitimate medical purpose when in fact it was prescribed solely to enrich Defendants; and (iv) the fee charged for the MWT devices was not in excess of the applicable Fee Schedule in existence at the time the claim was mailed and/or the maximum reimbursement amount allowed under the No-fault Law. In these and numerous other ways alleged herein, Yakubiak, through Gate Supply, designed and executed a fraudulent blueprint to bill and obtain payments from Plaintiffs for expensive MWT devices that they were not entitled to receive under the No-fault law and implementing regulations.

**4.      Fraudulent Billing for Cervical Electromagnetic Therapy Devices**

224.    In furtherance of the scheme to defraud alleged herein, Petruk, through Tara Supply, routinely submitted or caused to be submitted bills to Plaintiffs for Low Level Electromagnetic Therapy ("Cervical EMTT") Devices that were not provided as billed, supplied pursuant to fraudulent protocol of treatment, medically unnecessary and/or never provided.

225.    Each of the Covered Persons that received Cervical EMTT devices were involved in minor impact accidents and suffered only soft-tissue injuries, to the extent they suffered any injuries at all.

226.    Shortly after the accident, each of the Covered Persons visited multidisciplinary No-fault Clinics that, in exchange for kickbacks and/or other financial compensation, referred the Covered Persons for a standard battery of treatment that included, but is not limited to, referrals for physical therapy, chiropractic treatment, acupuncture, electrodiagnostic testing and basic DME. Indeed, within 30 days of the accident, the Covered Persons are dispensed a substantial and similar battery of regular DME, as well as expensive pain management Rental DME, such as Cervical EMTT Devices from Defendant Tara Supply, pursuant to a fraudulent protocol established by the No-fault Clinics that issue the fraudulent prescription.

227.    Various commercial insurers, such as Aetna, have issued policy bulletins that establish that high frequency pulsed electromagnetic stimulation (also known as therapeutic magnetic resonance) is experimental, investigational, or unproven for post-operative pain and edema. *See*

https://www.aetna.com/cpb/medical/data/100_199/0175.html#:~:text=Aetna%20considers%20high%20frequency%20pulsed,post%2Doperative%20pain%20and%20edema.

228.    Medicaid, which has specifically defined numerous HCPCS Codes for all types of DME in its Durable Medical Equipment, Orthotics, Prosthetics and Supplies Procedure Codes and Coverage Guidelines ("Medicaid DME Procedure Codes") contains no code for any Electromagnetic Transduction Therapy device or any similar electromagnetic field therapy item.

229.    In keeping with the fact that the prescriptions for the Rental DME were not medically necessary and were provided pursuant to predetermined fraudulent protocols, the DME purportedly prescribed did not provide any medical benefit to Covered Persons.

230.    In keeping with the fact that the prescriptions for the Rental DME were part of a predetermined protocol designed to maximize profits and not based upon medical necessity, the pre-printed prescriptions forms contained the same exact boilerplate language proclaiming, among other things, that the, "Cervical EMTT device will have a favorable synergic effect and significantly improve the results. EMTT is an effective treatment modality approved by FDA for such indications as maintaining or increasing range of motion, muscle re-education and relaxation of muscle spasms….The treatment will stimulate reaction pathways that result in pain and inflammation reduction."  There is, however, no discussion of any of the Covered Persons' actual individual needs and diagnoses.

231.    Notwithstanding the typical uses for the devices, referring HCPs routinely issue prescriptions for Cervical EMTT Devices for Covered Persons that were involved in minor impact accidents and suffered only minor, soft tissue injuries, to the extent the suffered any injuries at all, and in some instances, underwent or are about to undergo outpatient arthroscopic surgical procedures, along with a host of other expensive DME devices, designed to upcharge insurers for tens of thousands of dollars as part of a fraudulent protocol of medically unnecessary treatments. In that regard, whether prior to, contemporaneously with, or sometime after the dispensing of the

Cervical EMTT Device, the Covered Persons receive a substantial and similar battery of regular and Rental DME pursuant to a fraudulent protocol established by the No-fault Clinics that issue the fraudulent prescription. The Cervical EMTT Devices are often prescribed with one or more other Rental DME devices such as MWT Devices.

232.    In a legitimate medical clinic setting, the HCP prescribing pain management DME provider should evaluate and document multiple factors for the necessity of the Rental DME, including, but not limited to: (i) whether the Covered Person is capable of using the at-home treatment devices; (ii) whether the DME is likely to help improve the Covered Person's surgical recovery; and (iii) whether the Covered Person is likely to use the DME. In nearly all circumstances, the medical reports neglect to document any such findings nor describe how the Rental DME directly related to each Covered Persons' individual presentation for post-surgical recovery.

233.    Moreover, it is extremely improbable that virtually all of the Covered Persons who received DME from Tara Supply and other DME providers, who may have also undergone minimally invasive surgical procedures, would ultimately receive the same and/or nearly identical DME, despite being differently situated. However, pursuant to the predetermined fraudulent protocols implemented by Tara Supply and others, the Covered Persons were prescribed virtually identical pre- and/or post-surgical fraudulent Rental DME.

234.    In a legitimate medical clinic setting, when a Covered Person is prescribed DME by an HCP, the provider would indicate in a contemporaneous examination report the DME that was prescribed and the reasons for prescribing it. In keeping with the fact that the prescriptions for Rental DME provided to Covered Persons by Tara Supply were not medically necessary and provided pursuant to a predetermined fraudulent protocol, the contemporaneous examination

reports written by the HCPs virtually never referenced the Cervical EMTT supplied by Tara Supply and never explained the necessity for the device.

235.    In keeping with the fact that the Cervical EMTT were not medically necessary and were provided pursuant to a predetermined fraudulent protocol, the prescriptions issued by the medical clinics that purportedly examined the Covered Persons were issued on boilerplate, pre-printed prescriptions forms that contained the same exact boilerplate language ostensibly explaining the medical necessity for the device, along with the physicians generic statement concerning the efficacy of the device. There is, however, no discussion of any of the Covered Persons' individual needs and diagnoses, nor any explanation how the device will assist the specific Covered Person. What is more, on information and belief, in nearly all instances the device is prescribed for an identical period of 28 days regardless of the Covered Persons' conditions. By way of example and not limitation, Exhibit "9" in the accompanying Compendium of Exhibits is a representative sample of prescriptions with the identical, boilerplate language.

236.    In view of the foregoing, the Cervical EMTT supplied by Tara Supply were dispensed pursuant to protocol of treatment, without regard to medical necessity as part of an elaborate scheme to supply insureds with excessive and unnecessary Rental DME, in excessive amounts beyond what it was entitled to be reimbursed under the No-fault Law, in order to maximize reimbursement and exploit the payment formulas under the applicable Fee Schedule.

237.    On information and belief, the prescriptions for the Cervical EMTT Devices are never given to the Covered Persons. Instead, the prescriptions are sent from many of the same referring medical clinics directly to a predetermined Cervical EMTT Device provider in exchange for a kickback and/or other financial incentive or compensation.

238.    In numerous cases, the prescriptions from the referring providers are fabrications as part of the scheme to maximize reimbursement through these medically unnecessary rental items and the Cervical EMTT Devices in particular.

239.    On information and belief, upon receipt of the prescriptions purportedly filled by provision of Cervical EMTT Devices, Petruk, through Tara Supply, routinely submits bills to insurers indicating that the items is provided to the Covered Person for a single day, when, in actuality, the items is provided for rental periods of up to one month regardless of actual Covered Person need in order to maximize reimbursement.

240.    Oftentimes, the devices are delivered to the Covered Persons without their knowledge or expectation. Upon delivery, proper instruction on the proper use of the device and the risks associated with the device are not explained to the Covered Persons. In many cases and as a result, the Covered Persons do not use the device and/or use the device improperly, posing a risk to the Covered Person's health as well as rendering the device ineffective.

241.    At all relevant times mentioned herein, Tara Supply routinely billed Plaintiffs under code E1399 in the amount of $2,299.00 for a purported sale of a MWT Device.

242.    On information and belief, at all relevant times mentioned herein, to the extent anything was provided to Covered Persons at all, Tara Supply provided Covered Persons Compression Devices on a rental basis for the period of one month.

243.    In connection with such claims, Petruk, through Tara Supply, submitted or caused to be submitted wholesale invoices reflecting an acquisition cost of $1,695.00 per Cervical EMTT Device.

244.    The maximum permissible monthly rental rate for Cervical EMTT Devices billed for by Tara Supply under billing code E1399 is ten percent of its acquisition cost, or $169.50.

245.    Notwithstanding, Tara Supply grossly over-billed Plaintiffs for a one-month rental of Cervical EMTT Devices, far in excess of the maximum permissible for the Cervical EMTT Devices Tara Supply purportedly provided under code E1399.

246.    By way of example and not limitation, Petruk, through Tara Supply, routinely submitted to Plaintiffs bills for Cervical EMTT Devices under code E1399 in amounts up to and including $2,299.00 as if the items were provided to Covered Person for sale, when, on information and belief, the items were actually provided as a rental at a monthly rental far in excess of what is permissible under the No-fault Law. Exhibit "10" in the accompanying Compendium of Exhibits is a representative sample of claims where Petruk, through Tara Supply, submitted fraudulent bills to Plaintiffs for Cervical EMTT Devices under code E1399.

247.    Furthermore, by way of example and not limitation, the Appendix to the Complaint identifies a representative sample of predicate acts, including claim nos. 0768263469-02, 0773363270-02, and 0775309248-01, in which Petruk, through Tara Supply, mailed or caused to be mailed to Plaintiffs fraudulent claims for Cervical EMTT Devices, billed under code E1399, that were supplied pursuant to the fraudulent protocol of treatment described herein, in exchange for kickbacks and/or other financial compensation agreements, for medically unnecessary items in order to exploit and manipulate the payment formulas under the applicable Fee Schedule to maximize the charges that they could submit to Plaintiffs.

248.    The bills mailed or caused to be mailed by Petruk, through Tara Supply, were fraudulent in that they misrepresented that the Cervical EMTT Devices (i) were medically necessary when in fact they were not; (ii) they were provided pursuant to legitimate prescriptions when in fact they were not; (iii) they were prescribed for a legitimate medical purpose when in fact it was prescribed solely to enrich Defendants; and (iv) the fee charged for the Cervical EMTT

Devices was not in excess of the applicable Fee Schedule in existence at the time the claim was mailed and/or the maximum reimbursement amount allowed under the No-fault Law. In these and numerous other ways alleged herein, Petruk, through Tara Supply, designed and executed a fraudulent blueprint to bill and obtain payments from Plaintiffs for expensive Cervical EMTT Devices that they were not entitled to receive under the No-fault law and implementing regulations.

## **DISCOVERY OF THE FRAUD**

249.    To induce Plaintiffs to promptly reimburse their claims for Rental DME, Defendants have gone to great lengths to systematically conceal their fraud. By way of example and not limitation:

- The Retail Owner Defendants, through their respective DME Defendants, routinely and deliberately submitted facially valid claims for reimbursement that were based on a pre-determined protocol of treatment without regard for medical necessity;

- The Retail Owner Defendants, through their respective DME Defendants, routinely and deliberately concealed that its No-fault claims were submitted pursuant to an unlawful referral, and/or relationships between and among one or more of the Defendants and the No-fault Clinics in order to maximize reimbursement;

- The Retail Owner Defendants, through their respective DME Defendants, knowingly misrepresented and concealed that the DME Defendants' claims for reimbursement were based on a pre-determined protocol of treatment without regard for medical necessity in order to maximize reimbursement; and/or

- The Retail Owner Defendants, through their respective DME Defendants, knowingly and deliberately concealed the amounts the DME Defendants was entitled to be reimbursed in the bills submitted to Plaintiffs by misrepresenting the codes and reimbursement amounts as part of the scheme to manipulate the payment formulas under the applicable DME Fee Schedule in order to maximize the charges that they could submit to Plaintiffs and other insurers.

250.    Defendants engaged law firms to pursue the collection of their fraudulent No-fault claims submitted to Plaintiffs and other insurers, which routinely initiated hundreds of expensive

and time consuming civil actions and arbitration proceedings against Plaintiffs and other insurers to monetize their fraudulent No-fault claims in the event Defendants' fraudulent No-fault claims were not promptly paid.

251.    Defendants' ongoing collection efforts through numerous separate No-fault collection proceedings are a calculated and essential part of Defendants' fraudulent scheme, based on Defendants knowledge of the inability of an arbitrator or civil court judge in a single collection proceeding, typically involving either a single Covered Person or a single bill, to effectively address the Defendants' large-scale and complex fraudulent scheme involving a predetermined treatment protocol applied to numerous Covered Persons across hundreds of claims purportedly receiving treatment at numerous different No-fault clinics.

252.    Plaintiffs are under a statutory and contractual obligation to promptly and fairly process claims within 30 days. The documents submitted to Plaintiffs in support of the fraudulent claims at issue, combined with the material misrepresentations, omissions and acts of fraudulent concealment described above, were designed to, and did cause Plaintiffs to justifiably rely on them. As a proximate result, Plaintiffs have incurred damages of more than $117,000.00 based upon the fraudulent bill submissions.

253.    Based upon Defendants' material misrepresentations and their serial efforts to conceal the various components to their scheme to defraud, Plaintiffs did not discover and could not have reasonably discovered the injury until in or after January 2025.

## FIRST CLAIM FOR RELIEF

## AGAINST DEFENDANT HAIDARZHY, ABC CORPORATIONS 1 THROUGH 5 AND JOHN DOES 1 THROUGH 5

## (RICO, pursuant to 18 U.S.C. § 1962(c))

254.    The allegations of paragraphs 1 through 253 are hereby repeated and re-alleged as though fully set forth herein.

### THE RICO ENTERPRISE

255.    At all times relevant herein, Defendant Leaf One Supply was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

256.    From in or about August 2024 through the date of the filing of this Complaint, Defendants Haidarzhy, one or more of the ABC Corporations 1 through 5, and one or more of the John Does 1 through 5 were "persons" under the RICO statute and knowingly conducted and participated in the affairs of the Leaf One Supply enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

257.    At all relevant times mentioned herein, Defendant Haidarzhy, together with others unknown to Plaintiffs, exerted control over and directed the operations of the Leaf One Supply enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs that were based, in part, on the utilization of fraudulent prescriptions.

258.    On information and belief, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5 participated in the scheme by providing Rental DME pursuant to a predetermined course of treatment, irrespective of medical necessity, based on illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics, as well as bogus documentation, that grossly inflated the purported cost and/or necessity of the Rental DME to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Haidarzhy required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME claims.

259.    It was both foreseeable and the intended consequence of the illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics, that the bogus documentation provided by one or more of the John Does 1 through 5, through one or more of the ABC Corporations 1 through 5, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

### The Pattern of Racketeering Activity
### (Racketeering Acts)

260.    The racketeering acts set forth herein were carried out on a continued basis for nearly a one-year period, were related and similar and were committed as part of the ongoing scheme of Defendant Haidarzhy, one or more of the ABC Corporations 1 through 5, and one or more of the John Does 1 through 5 to fraudulently bill for DME to defraud insurers, and, if not stopped, such acts will continue into the future.

261.    This pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as the Leaf One Supply enterprise continues to pursue collection on the fraudulent billing to the present day.

262. As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Haidarzhy, with the knowledge and intent of one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Leaf One Supply enterprise based upon materially false and misleading information.

263. Through the Leaf One Supply enterprise, Defendant Haidarzhy submitted numerous fraudulent claim forms seeking payment for Rental DME that was purportedly (but not actually) provided to numerous Covered Persons as billed. The bills and supporting documents that were sent by Defendant Haidarzhy, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Haidarzhy, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Leaf One Supply enterprise through the filing of this Complaint.

264. A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Haidarzhy in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

265. Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

266. Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

### Damages

267. By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company have been injured in their business and property and have been damaged in the aggregate amount presently in excess of $79,000.00, the exact amount to be determined at trial.

268. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company are entitled to recover from Defendants Haidarzhy, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

### SECOND CLAIM FOR RELIEF

### AGAINST DEFENDANT YAKUBIAK, ABC CORPORATIONS 1 THROUGH 5 AND JOHN DOES 1 THROUGH 5

### (RICO, pursuant to 18 U.S.C. § 1962(c))

269. The allegations of paragraphs 1 through 253 are hereby repeated and re-alleged as though fully set forth herein.

### THE RICO ENTERPRISE

270. At all times relevant herein, Defendant Gate Supply was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

271. From in or about July 2024 through the date of the filing of this Complaint, Defendants Yakubiak, one or more of the ABC Corporations 1 through 5, and one or more of the John Does 1 through 5 were "persons" under the RICO statute and knowingly conducted and participated in the affairs of the Gate Supply enterprise through a pattern of racketeering activity,

including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

272.    At all relevant times mentioned herein, Defendant Yakubiak, together with others unknown to Plaintiffs, exerted control over and directed the operations of the Gate Supply enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs that were based, in part, on the utilization of fraudulent prescriptions.

273.    On information and belief, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5 participated in the scheme by providing Rental DME pursuant to a predetermined course of treatment, irrespective of medical necessity, based on illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics, as well as bogus documentation, that grossly inflated the purported cost and/or necessity of the Rental DME to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Yakubiak required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent Rental DME claims.

274.    It was both foreseeable and the intended consequence of the illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics, that the bogus documentation provided by one or more of the John Does 1 through 5, through one or more of the ABC Corporations 1 through 5, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

**The Pattern of Racketeering Activity**
**(Racketeering Acts)**

275.    The racketeering acts set forth herein were carried out on a continued basis for nearly a one-year period, were related and similar and were committed as part of the ongoing scheme of Defendant Yakubiak, one or more of the ABC Corporations 1 through 5, and one or more of the John Does 1 through 5 to fraudulently bill for Rental DME to defraud insurers, and, if not stopped, such acts will continue into the future.

276.    This pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as the Gate Supply enterprise continues to pursue collection on the fraudulent billing to the present day.

277.    As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Yakubiak, with the knowledge and intent of one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Gate Supply enterprise based upon materially false and misleading information.

278.    Through the Gate Supply enterprise, Defendant Yakubiak submitted numerous fraudulent claim forms seeking payment for Rental DME that was purportedly (but not actually) provided to numerous Covered Persons as billed. The bills and supporting documents that were sent by Defendant Yakubiak, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Yakubiak, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1

through 5 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Gate Supply enterprise through the filing of this Complaint.

279. A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Yakubiak in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

280. Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

281. Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**Damages**

282. By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiff Allstate Fire and Casualty Insurance Company has been injured in their business and property and has been damaged in the aggregate amount presently in excess of $5,200.00, the exact amount to be determined at trial.

283. Pursuant to 18 U.S.C. § 1964(c), Plaintiff Allstate Fire and Casualty Insurance Company is entitled to recover from Defendants Yakubiak, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

### THIRD CLAIM FOR RELIEF

### AGAINST DEFENDANT PETRUK, ABC CORPORATIONS 1 THROUGH 5 AND JOHN DOES 1 THROUGH 5

### (RICO, pursuant to 18 U.S.C. § 1962(c))

284.    The allegations of paragraphs 1 through 253 are hereby repeated and re-alleged as though fully set forth herein.

### THE RICO ENTERPRISE

285.    At all times relevant herein, Defendant Tara Supply was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

286.    From in or about August 2024 through the date of the filing of this Complaint, Defendants Petruk, one or more of the ABC Corporations 1 through 5, and one or more of the John Does 1 through 5 were "persons" under the RICO statute and knowingly conducted and participated in the affairs of the Tara Supply enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

287.    At all relevant times mentioned herein, Defendant Petruk, together with others unknown to Plaintiffs, exerted control over and directed the operations of the Tara Supply enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs that were based, in part, on the utilization of fraudulent prescriptions.

288.    On information and belief, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5 participated in the scheme by providing Rental DME pursuant to a predetermined course of treatment, irrespective of medical necessity, based on illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics, as well as bogus documentation, that grossly inflated the purported cost and/or necessity of the Rental DME to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Petruk required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent Rental DME claims.

289.    It was both foreseeable and the intended consequence of the illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics, that the bogus documentation provided by one or more of the John Does 1 through 5, through one or more of the ABC Corporations 1 through 5, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

### The Pattern of Racketeering Activity
### (Racketeering Acts)

290.    The racketeering acts set forth herein were carried out on a continued basis for nearly a one-year period, were related and similar and were committed as part of the ongoing scheme of Defendant Petruk, one or more of the ABC Corporations 1 through 5, and one or more of the John Does 1 through 5 to fraudulently bill for Rental DME to defraud insurers, and, if not stopped, such acts will continue into the future.

291.    This pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as the Tara Supply enterprise continues to pursue collection on the fraudulent billing to the present day.

292.    As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Petruk, with the knowledge and intent of one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Tara Supply enterprise based upon materially false and misleading information.

293.    Through the Tara Supply enterprise, Defendant Petruk submitted numerous fraudulent claim forms seeking payment for Rental DME that was purportedly (but not actually) provided to numerous Covered Persons as billed. The bills and supporting documents that were sent by Defendant Petruk, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Petruk, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Tara Supply enterprise through the filing of this Complaint.

294.    A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Petruk in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

295.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

296.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**Damages**

297.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiff Allstate Fire and Casualty Insurance Company has been injured in their business and property and has been damaged in the aggregate amount presently in excess of $6,500.00, the exact amount to be determined at trial.

298.    Pursuant to 18 U.S.C. § 1964(c), Plaintiff Allstate Fire and Casualty Insurance Company is entitled to recover from Defendants Petruk, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

**FOURTH CLAIM FOR RELIEF**

**AGAINST THE RETAIL DEFENDANTS**

**(Common Law Fraud)**

299.    The allegations of paragraphs 1 through 253 are hereby repeated and realleged as though fully set forth herein.

300.    The Retail Defendants made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs for payment.

301.    Each and every bill and supporting documentation submitted by the Retail Defendants to Plaintiffs set forth false and fraudulent amounts for reimbursement for Rental DME that they purportedly supplied to Covered Persons. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the Covered Persons and the consumer public.

302.    The Retail Defendants intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained

false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality, and cost of the Rental DME purportedly supplied to Covered Persons;

- False and misleading statements as to the amounts the DME Defendants were entitled to be reimbursed under the No-fault Law;

- False and misleading statements that the items were (a) medically necessary when the items were the product of a predetermined protocol of treatment, designed to maximize the reimbursement in furtherance of a scheme to defraud without regard to the actual medical needs of the Covered Persons; (b) not billed in excess of the maximum permissible monthly rental charge or maximum accumulated rental charge for such equipment, supplies and services provided on a rental basis under the applicable Fee Schedule; (c) not billed in excess of the lesser of the providers' acquisition cost plus 50% or the usual and customary price charged by durable medical equipment providers to the general public if no maximum monthly rental rate is provided in the applicable Fee Schedule; and/or (d) not billed in excess of the lower of a monthly rental rate of 10% of Defendants' acquisition cost if no maximum monthly rental rate is provided in the applicable Fee Schedule for dates of service after June 1, 2023;

- False and misleading prescriptions for the Rental DME purportedly supplied to Covered Persons, generically describing the item to conceal the type of item being prescribed; and/or

- False and misleading prescriptions for Rental DME, concealing the fact that the (a) Rental DME was prescribed and supplied pursuant to a pre-determined, fraudulent protocol irrespective of medical necessity; (b) Rental DME was not covered by the applicable DME Fee Schedule; and (c) Rental DME was generically described on the prescriptions, all of which was designed to permit the Retail Owner Defendants, through their respective DME Defendants, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

303.    The foregoing was intended to deceive and mislead Plaintiffs into paying the DME Defendants' claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

304.     The Retail Defendants knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

305.     Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of the Retail Defendants.

306.     Had Plaintiffs known of the fraudulent content of the bills, prescriptions, and delivery receipts, they would not have paid the DME Defendants' claims for No-fault insurance benefits submitted in connection therewith.

307.     Furthermore, the far-reaching pattern of fraudulent conduct by the Retail Defendants evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed, and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

308.     By reason of the foregoing, Plaintiffs have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined but believed to be in excess of $117,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages, and other relief the Court deems just.

## FIFTH CLAIM FOR RELIEF

## AGAINST THE RETAIL DEFENDANTS

### (Unjust Enrichment)

309.     The allegations of paragraphs 1 through 253 are hereby repeated and realleged as though fully set forth herein.

310. By reason of their wrongdoing, the Retail Defendants have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

311. Plaintiffs are therefore entitled to restitution from the Retail Defendants in the amount by which it has been unjustly enriched.

312. By reason of the foregoing, Plaintiffs have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $117,000.00, the exact amount to be determined at trial, plus interest, costs, and other relief the Court deems just.

**SIXTH CLAIM FOR RELIEF**

**AGAINST THE DME DEFENDANTS**

**(Declaratory Judgment under 28 U.S.C. § 2201)**

313. The allegations of paragraphs 1 through 253 are hereby repeated and realleged as though fully set forth herein.

314. At all relevant times mentioned herein, each and every bill mailed by the Retail Owner Defendants, through their respective DME Defendants, to Plaintiffs sought reimbursement in excess of the amounts authorized by the No-fault Law and effective DME Fee Schedule by materially misrepresenting the Rental DME provided, if provided at all, as well as the cost and quality of the billed for Rental DME.

315. To the extent the Rental DME were provided at all, each item was medically unnecessary because it was provided pursuant to a predetermined course of treatment, irrespective of medical need.

316.    At all times relevant herein, the DME Defendants, through the DME Defendants, exploited the No-fault Law and applicable Fee Schedule through the utilization of various deceptive billing tactics engineered to maximize the amount of reimbursement from insurers, in general, and Plaintiffs, in particular, through the submission of fraudulent billing documents that misrepresented the amounts the Defendants were entitled to be reimbursed, as well as the medical necessity of the items purportedly provided to Covered Persons.

317.    In view of the DME Defendants' submission of fraudulent bills by the Retail Owner Defendants, through their respective DME Defendants, to Plaintiffs, Plaintiffs contend that the DME Defendants have no right to receive payment for any pending bills it has submitted because:

- The DME  Defendants, through the DME Defendants, made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs to obtain reimbursement far in excess of the maximum permissible charges they could submit to Plaintiffs;

- The DME Defendants, through the DME Defendants, made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs seeking reimbursement for Rental DME that they never supplied to Covered Persons; and

- The DME Defendants, through the DME Defendants, made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs seeking reimbursement for Rental DME that, to the extent anything was provided at all, was provided pursuant to a predetermined protocol of treatment without regard to medical necessity.

318.    As the DME Defendants, through the DME Defendants, have knowingly made the foregoing false and fraudulent misrepresentations about the Rental DME purportedly supplied to Covered Persons and the amounts it was entitled to be reimbursed, in order to manipulate the payment formulas under the No-fault Law and effective DME Fee Schedules in its claims submissions and obtain reimbursement far in excess of the maximum permissible charges it was

entitled to receive for medically unnecessary items provided pursuant to a fraudulent protocol of treatment, it is respectfully requested that this Court issue an order declaring that the DME Defendants are not entitled to receive payment on any pending, previously-denied and/or submitted unpaid claims and Plaintiffs, therefore, are under no obligation to pay any of the DME Defendants' No-fault claims.

319.    Plaintiffs have no adequate remedy at law.

320.    The DME Defendants, through the DME Defendants, will continue to bill Plaintiffs for false and fraudulent claims for reimbursement absent a declaration by this Court that Plaintiffs have no obligation to pay the pending, previously-denied and/or submitted unpaid claims, regardless of whether such unpaid claims were ever denied, regardless of the purported dates of service.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demands a trial by jury.

**WHEREFORE,** Plaintiffs demand judgment as follows:

i)    Compensatory damages in an amount in excess of $117,000.00, the exact amount to be determined at trial, together with prejudgment interest;

ii)    Punitive damages in such amount as the Court deems just;

iii)    Treble damages, costs, and reasonable attorneys' fees on the First, Second, and Third Claims for Relief, together with prejudgment interest;

iv)    Compensatory and punitive damages on the Fourth Claim for Relief, together with prejudgment interest;

v)    Compensatory damages on the Fifth Claim for Relief, together with prejudgment interest;

vi)     Declaratory relief on the Sixth Claim for Relief, declaring that Plaintiffs have no obligation to pay any No-fault claims submitted by the DME Defendants because (1) the DME Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs to obtain reimbursement far in excess of the maximum permissible charges they could submit to Plaintiffs; and (2) the DME Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs seeking reimbursement for Rental DME that was provided pursuant to a predetermined protocol of treatment without regard to medical necessity; and

vii)    Costs, reasonable attorneys' fees, and such other relief that the Court deems just and proper.

Dated: New York, New York
        February 20, 2026

MANNING & KASS, ELLROD, RAMIREZ,
   TRESTER LLP

By:   /s/ Lee Pinzow             
    Robert A. Stern, Esq.
    James McKenney, Esq.
    Lee Pinzow, Esq.
    R. Drake Herring, Esq.
    *Attorneys for Plaintiffs*
    100 Wall Street, Suite 700
    New York, NY 10005
    Phone: (212) 858-7769

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY, ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY AND ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY, | CIVIL ACTION |
| | 26-CV-1004 |
| PLAINTIFFS, | COMPLAINT |
| -against- | |
| LEAF ONE SUPPLY INC, GATE SUPPLY INC., TARA SUPPLY INC., MYKOLA HAIDARZHY, IRINA YAKUBIAK, NAZAR PETRUK, JOHN DOES 1 THROUGH 5 AND ABC CORPORATIONS 1 THROUGH 5, | (TRIAL BY JURY DEMANDED) |
| DEFENDANTS. | |

# COMPLAINT

MANNING & KASS, ELLROD, RAMIREZ, TRESTER LLP
ATTORNEYS FOR PLAINTIFFS
100 WALL STREET, SUITE 700
NEW YORK, NY 10005
TELEPHONE: (212) 858-7769